MAX N. TOBIAS, JR, Judge.
 

 I, The defendant, Michael Davis (“Davis”), was charged by bill of information on 23 February 2005 with four counts of armed robbery, violations of La. R.S. 14:64.
 
 [1]
 
 He pleaded not guilty at his 25 February 2005 arraignment.
 
 [2]
 
 On 31 October 2007, the trial court denied the defendant’s motion in limine as to evidence concerning the murder of New Orleans Police Department (“NOPD”) Officer Christopher Russell, who was shot while responding to the armed robberies at issue in the instant matter.
 
 [3]
 
 On 28 February 2008, the trial court denied the defendant’s motion to quash and motion to suppress his statement, and granted a separate motion in limine filed by him.
 
 [4]
 
 On the first day of trial, 12 May 2008, the State
 
 nolle prose-quied
 
 Count One of the bill of information. On 14 May 2008, a 12twelve-person jury found Davis guilty as charged as to Counts Two, Three and Four.
 

 On 22 May 2008, the trial court denied Davis’ motions for new trial and for post verdict judgment of acquittal, and the court sentenced defendant to ninety-nine years at hard labor without benefit of parole, probation or suspension of sentence as to each of Counts Two, Three and Four, with the sentences to be served consecutively.
 
 [5]
 
 On that same date, the trial court adjudicated the defendant as a fourth-felony habitual offender as to Count Two. The court immediately vacated Davis’ original sentence imposed as to Count Two and resentenced him to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence, such sentence to be served consecutively to the others. Davis’ motion for appeal was granted.
 

 On 2 October 2008, the trial court denied the defendant’s motions to reconsider sentence and for new trial.
 

 FACTS
 

 Davis was charged with and convicted of three counts of armed robbery, committed inside the Club Tango bar in New Orleans on 4 August 2002. As the robbers were escaping the bar, one of them — not defendant herein — fired a handgun at two police
 
 *203
 
 officers, fatally striking Officer Christopher Russell.
 

 Annie Florence Lockett, a supervisor in the NOPD 911 call center, identified an incident sheet from an 4 August 4, 2002 911 call and an audiotape of the call; the audiotape was played for the jury.
 

 | ;-.Qletha Washington testified that she was in the Club Tango, located at the corner of Spain and North Roman Streets in New Orleans, in the early morning hours of 4 August 2002. She was playing a video poker machine in the rear of the bar at approximately 3:00 a.m. when she heard a commotion and someone say: “You think this a joke. This an armed robbery.” Ms. Washington looked out and saw a gunman wearing a light T-shirt who had a “big” silver gun in his hand. There was more than one armed robber. She hid behind a video poker machine and dialed 911 on her cell phone. Ms. Washington stated on cross examination that she did not see the defendant come into the bar that morning. She did not hear his voice and did not know his voice. Davis did not take anything from her that morning. She estimated that fifteen to twenty people were in the bar at the time. There was no back door to the bar of which she was aware.
 

 NOPD K-9 Sergeant Rickey Blanchard searched the area around the Club Tango on 4 August 2002 after the robbery. The officer’s canine found Davis hiding in some bushes in front of 1840 St. Roch Street, around the corner from the bar. A semiautomatic handgun was found where he was hiding, as well as some currency and some jewelry. Sergeant Blanchard identified photos of the scene where Davis was found hiding. The sergeant searched for the two other suspects without success.
 

 Sergeant Blanchard stated on cross examination that he made a use-of-force report in connection with the apprehension of Davis, because his canine bit the defendant. The officer said he would have been told if the other officers who actually secured Davis had any weapons on his person, and that he recalled only 14the weapon in the shrubbery being recovered. He said Davis was less than an arm’s length away from the gun — basically on top of it.
 

 Ronnie Cravens testified that he was in the men’s room at Club Tango when the robbery began. A gunman came to the rest room, ordered him out, ordered him to take off his clothes, put the clothes in a trash bag that the robber was holding, and go back into the restroom and lie on the floor. Approximately $100.00 was missing from his shirt pocket when he retrieved his clothes from the bag after the robbery. Seven or eight other customers were forced to lie in the restroom with him. He stated that he could not clearly see the person with the gun. He replied in the negative when asked on cross examination whether he had seen the defendant in the bar that night. He could not say who took his money. He did not see anyone else in the bar with a weapon that night besides the person who confronted him at the door of the restroom.
 

 Joseph Frederichs was near the front door of the Club Tango when three or four men with weapons came in and announced a robbery. He and other customers were ordered to empty their pockets and put the items in a bag, to take off their clothes, put the clothes into garbage bags, and to go into the restroom. Frederichs could not describe or identify any of the robbers. He was told not to look at them. Approximately $360.00 was stolen from him.
 

 Peggy Pritchard tended bar at the Club Tango, which was owned by her sister, brother, and her sister’s husband. She testified that she buzzed Billy/Willie Wil-bon, a longtime friend of her sister’s and
 
 *204
 
 her sister’s family, into the bar at approximately 3:00 a.m. on the morning of the robbery. He ordered and received a beer, and stayed for about ten minutes before asking her to buzz him out. Mr. | BWilbon opened the door very wide to exit, allowing three men with guns drawn to come inside. She described the three individuals in terms of height, clothing, and skin col- or/tone. Ms. Pritchard described the bar lighting and replied in the affirmative when asked whether she was able to see the perpetrators’ faces. The robbers made everyone get on the floor, demanded money and jewelry, and then ordered them to take off their clothes. One pointed a gun at her head and asked for the money from the cash register, and she gave him that and other money that was kept behind the bar. She described that robber as five feet seven inches to five feet nine inches tall, with really dark skin and a low haircut.
 

 Ms. Pritchard said another robber, whom she referred to as the “shooter,” was brown-skinned, around five feet seven inches tall, weighing between 170 and 190 pounds. He kept threatening to shoot people. He told Mr. Pritchard to let them out, meaning to unlock the door with the buzzer. She thought she noticed a blue light flashing. She buzzed open the door and the “shooter” exited and began shooting at a police car. The other two robbers in the bar frantically tried to get out. One climbed on the bar and tried to get into the ceiling and the other tried to get out of the window of the ladies restroom. Ms. Pritchard eventually buzzed them out the front door.
 

 Later that morning Ms. Pritchard was shown a photo lineup consisting of six photographs. She positively identified Davis in that lineup. She referred to him as robber number three. She was one hundred percent certain of her identification. She also identified the other two robbers. Ms. Pritchard admitted on cross examination that in a prior statement to police she said she could not really tell the officer what robber number three looked like, that she really did not get a good look at him, and about all she could say was that he was brown-skinned and was [,¡wearing dark clothes. However, she maintained during cross examination that in fact she did get a good look at him. She said she gave her clothes to Davis and saw him come in the door, but had not spent a lot of time with him. She said she did not know why she told the officer interviewing her that she really did not get a good look at him. She viewed the photo lineup in which she identified Davis right after giving the statement in which she said she really did not get a good look at him.
 

 NOPD Officer Mary Colon testified that on 4 August 2002 she was with her field training officer, Officer Christopher Russell. They received an armed robbery in progress call at approximately 3:20 a.m. Subsequent information led them to believe it was only someone outside the bar asking people for money and drugs. They drove slowly up Spain Street from North Claiborne Avenue. They pulled up to the bar at the corner of North Roman and Spain Streets. Officer Colon observed a black male walk out the front door of the bar. He took three or four steps, stopped, looked at Officer Colon and Officer Russell, then pulled a gun from his side and started shooting. She described the male as dark-skinned, approximately five feet nine or five feet ten inches tall, wearing a very large white shirt, with a short hair cut and no facial hair. She estimated that he was in his late teens or early twenties. The first bullet went through her window. She did not know where the others went.
 

 Officer Colon realized that Officer Russell’s seat was empty and that his door was
 
 *205
 
 open. She leaned over and saw Officer’s Russell’s feet on the ground and noticed that he was not moving. She looked back over her right shoulder and saw a second individual come out of the bar, also holding a gun. He was wearing either black or dark gray clothing and was approximately six feet tall, with a thin 17build and a short haircut. He stopped behind the shooter, and then they both ran behind the building. Officer Russell was taken to University Hospital. While there, Officer Colon was leaving a restroom in the company of another officer, Officer Rose Houston, when she saw the second robber/gunman who had come out of the Club Tango that night. She pointed at him saying, “That’s him, that’s him.” Officer Colon identified Davis in court as that same person. Officer Colon also identified a number of photographs of the crime scene.
 

 Officer Colon said the shooter was twelve to fifteen feet away when he shot at her and Officer Russell. She said Davis had something shiny in his right hand when he came out of the bar that she assumed was a gun. She did not recall seeing any money or jewelry in his hand. When she saw Davis again in the hospital he had two police officers walking behind him.
 

 Former NOPD Officer and Crime Scene Technician Millard Green processed what he recalled were three or four crime scenes in connection with the armed robbery at the Club Tango on 4 August 2002. He identified his forty-five page report and referred to it several times to refresh his memory. Mr. Green said that he recovered a Larson L38 semi-automatic handgun, serial number 402693, with a magazine containing five live .380 caliber cartridges; a black stocking cap; a number of other items (such as key rings, a ring, a yellow metal bracelet and a yellow metal Citizen brand watch); a blood sample from the sidewalk; approximately $65.00 in mixed denominations; and some gold dental caps, all in front of 1845 St. Roch Street. He also photographed the scene, taking photos of,
 
 inter alia,
 
 several key rings in the bushes that were a foot or two from the handgun; some trampled flowers in that area; and blood on the sidewalk. A chrome-plated Smith & Wesson .357 Magnum caliber revolver, serial number EEV5088, was | ¡¡recovered from the roof of the garage at 1818 St. Roch Street. A Nokia cell phone was recovered in an alley at that location.
 

 Former NOPD Homicide Detective Marco Demma, Jr. investigated the armed robbery of the Club Tango and the murder of Officer Russell. A bullet hole was present in the ceiling of the bar, and it was determined that one of the robbers had discharged a .380 caliber firearm while attempting to push open one of the seal tabs on the ceiling and escape from police. A .380 Larson semiautomatic handgun was found partially buried in the dirt in a garden at 1840 St. Roch Street, and it was in close proximity to numerous personal articles such as jewelry, a ring, and several gold dental fillings. The detective identified the Larson .380 handgun. Davis was apprehended before Detective Demma arrived on the scene. Davis was transported by police to the hospital to be treated for dog bites.
 

 Detective Demma said Davis was then transported to the homicide office where he and Detective Dwight Deal read him his rights and asked him if he wanted to give a statement. Detective Demma identified a rights-of-arrestee form that Davis signed, waiving his rights. Davis briefly explained his involvement and that of Willie Wilbon, Dwight Patterson, and another individual he knew as “Slim D.” He later gave a formal statement that was recorded. Detective Demma was there when that state-
 
 *206
 
 merit began, but left at some point, and Detective Deal continued to take the statement without him. He had no further participation in the investigation insofar as Davis was concerned.
 

 Detective Demma testified on cross examination that the rights-of-arrestee form was signed by defendant at 11 a.m. on 4 August 2002. Detective Deal prepared the form, but Detective Demma witnessed Davis sign it. Detective Deal asked the defendant if he could read and write, and Detective Demma believed JjDavis indicated he could. Davis then indicated to Detective Deal that he wanted to give a voluntary statement. Detective Demma believed Davis had some bandages on his arms from the dog bites, but not on his face, and he said that other than the dog bites Davis was in good condition. He replied in the affirmative when asked whether Davis would have given the recorded statement at around 5:20 p.m. on 4 August 2002, approximately fifteen hours after he had been arrested. (Detective Demma said Davis was at the hospital for seven or eight hours.) The detective did not know whether Davis received any medication at the hospital, and he did not ask him if he had. The defendant was not allowed to use the telephone; he was allowed to have something to drink and use the restroom. He was not beaten at police headquarters. He was handcuffed in front throughout the six or seven hours that he was in the homicide office. Detective Demma had no reports indicating that items found in the bushes at 1840 St. Roch Street had been checked for fingerprints.
 

 NOPD Lieutenant Michael Field testified that he was at the hospital when Officer Russell was brought in on 4 August 2002. After Officer Russell was pronounced dead, he was put in charge of securing Davis at the hospital until he was transported to the homicide division. He and Detective Barrett Martin were the only two officers with the defendant at the hospital. Davis was placed in a police car and taken to police headquarters, followed by Lieutenant Field in his unit. Once he turned the defendant over to homicide officers, his assignment was completed.
 

 NOPD Sergeant James Anderson testified that he was with the homicide division on 4 August 2002 and was the lead investigator in the murder of Officer Russell. He showed Club Tango bartender Peggy Pritchard a photo lineup at 7:07|ina.m. that day. She immediately identified a photo of Davis, without any suggestion, force, or coercion.
 

 NOPD Officer Winston Harbin, Jr. was called to the scene of the 4 August 2002 robbery/murder at the Club Tango as a homicide detective. He logged into the evidence room a number of recordings, including one of the defendant’s confession/statement.
 

 Orleans Parish Criminal District Court evidence and property clerk Kenneth Brown was one of the custodians of evidence stored at the court. He testified that the office had logged in a videotape of Davis’ statement, but that it had been lost/destroyed in chest-high flood waters that inundated the evidence room in the aftermath of Hurricane Katrina. Mr. Brown identified the original and a photocopy of the evidence log showing the entry.
 

 Former NOPD Homicide Detective Dwight Deal testified that he was recovering from back surgery on 4 August 2002, and had been out of work since May. He was called in on the case because of his expertise in interview and interrogation. His commander told him that the police had suspects in Officer Russell’s murder, but that they were not talking. The commander told Detective Deal they needed someone to come in and talk to, interview,
 
 *207
 
 and interrogate the suspects. Detective Deal thought he first began interviewing Davis close to 4:00 p.m. He advised Davis of his rights verbally and then by a rights-of-arrestee form. Davis made Detective Deal appreciate that he understood his rights, that he understood them well, and that he wished to cooperate and speak with him. Davis signed the form. Detective Deal confirmed that Detective Demma was present when the rights-of-arrestee form was executed, and that Detective Demma’s name appeared on the form. Detective Deal also advised Davis of his rights prior to | ntaking the recorded statement, which began after Davis gave an oral unrecorded statement. Detective Deal testified that Davis wanted to make it clear what his role in the robbery had been — and what it had not been. Detective Deal identified a copy of an audiotape of Davis’ statement and a transcription of that statement. The audiotape was played for the jury.
 

 Detective Deal testified on cross examination that he arrived at police headquarters between 9:00 and 9:30 a.m. on 4 August 2002, but had no contact with Davis until approximately 4 p.m. He understood the defendant had already been advised of his rights. The written waiver of rights form was executed after he arrived. Detective Deal testified that he absolutely asked Davis if he understood that he was signing the form to waive his rights before Davis signed the form. The formal audio-taped statement, which began about 5:20 p.m., reflects that he advised Davis of his rights. Detective Deal said he could not recall whether he or the defendant checked off the box indicating Davis understood that he was waiving his rights. Defense counsel questioned Detective Deal as to part of the formal recorded statement, as follows:
 

 Q “And you have the right to have an attorney or an appointed attorney present at [sic] time of questioning, or giving any statement”, and the answer by Mr. Davis:
 

 A ‘Tes, sir. Well like, can I have a — which means something else, confession at this time.”
 

 The next question you asked Mr. Davis is
 

 Q While you give our statement, do you want to give us a statement at this time concerning this matter?”
 

 112Pefense counsel asked Detective Deal why he asked Davis the second question. He said he thought the defendant’s answer was “inaudible [sic] to my question.” He also mentioned that he thought Davis’ voice was “fading out” at times. Detective Deal did not recall whether he provided the defendant with water, something to drink, or bathroom privileges while he was with him.
 

 Detective Deal was asked on redirect examination whether he forced or coerced the defendant into giving a statement, and he replied: “Absolutely not.” Asked if he promised Davis anything in exchange for his statement, he said: “Nothing whatsoever.”
 

 ERRORS PATENT
 

 A review of the record reveals no patent errors.
 

 ASSIGNMENT OF ERROR NO. 1
 

 In his first assignment of error, Davis argues that the trial court erred in allowing into evidence testimony concerning the murder of NOPD Officer Christopher Russell.
 

 The state correctly points out that this issue was raised by Davis in an application for supervisory writs filed by the accused, seeking review of the trial court’s denial of his motion in limine to exclude evidence of Officer Russell’s murder. This court denied Davis’ writ application, stating simply:
 

 
 *208
 
 “Writ Denied.”
 
 [6]
 
 The state argues that the “law of the case” doctrine bars Davis from raising this issue on appeal.
 

 In
 
 Delta Chemical Corp. v. Lynch,
 
 07-0431, p. 8 (La.App. 4 Cir. 2/27/08), 979 So.2d 579, 585, this court set forth the law of the case doctrine, quoting
 
 Day v. Campbell-Grosjean Roofing & Sheet Metal Corp.,
 
 260 La. 325, 330, 256 So.2d 105, 107 (La.1972), as follows:
 

 With regard to an appellate court, the “law of the case” refers to a policy by which the court will not, on a subsequent appeal, reconsider prior rulings in the same case. This policy applies only against those who were parties to the case when the former appellate decision was rendered and who thus had their day in court. Among reasons assigned for application of the policy are: the avoidance of indefinite relitigation of the same issue; the desirability of consistency of the result in the same litigation; and the efficiency, and the essential fairness to both parties, of affording a single opportunity for the argument and decision of the matter at issue.
 

 Nevertheless, the law-of-the-case principle is applied merely as a discretionary guide: Argument is barred where there is merely doubt as to the correctness of the former ruling, but not in cases of palpable former error or so mechanically as to accomplish manifest injustice. Further, the law-of-the-case principle is not applied so as to prevent a higher court from examining the correctness of the ruling of the previous court.
 

 See also, Zatarain v. WDSU-Television, Inc.,
 
 95-2600, p. 10 (La.App. 4 Cir. 4/24/96), 673 So.2d 1181, 1186 (“This court generally applies the law of the case’ doctrine when reviewing an issue decided on supervisory writs as part of the appeal of the case following a trial on the merits, except when it finds either that the previous decision is based on palpable error or that manifest injustice would result.”).
 

 We do not find that the law of the case doctrine bars Davis from raising the same issue on appeal. That is, our denial of Davis’ earlier writ application merely means, in essence, that we declined to review the issue at that time.
 

 Our review of the issue now satisfies us that evidence concerning the murder of Officer Russell was part of the
 
 res gestae
 
 and admissible as integral act |,4evidence under La. C.E. art. 404 B(l).
 
 [7]
 
 The Louisiana Supreme Court elaborated on what was referred to as the
 
 res gestae
 
 under former La. R.S. 15:448 and integral act evidence under La. C.E. art. 404 B(l) in
 
 State v. Colomb,
 
 98-2813, pp. 3-4 (La.10/1/99), 747 So.2d 1074, 1075-1076, as follows
 

 This Court has long approved of the introduction of other crimes evidence, both under the provisions of former R.S. 15:448 relating to
 
 res gestae
 
 evidence and as a matter of integral act evidence under La. C.E. art. 404(B), “when it is related and intertwined with the charged offense to such an extent that the state could not have accurately presented its case without reference to it.”
 
 State v. Brewington,
 
 601 So.2d 656, 657 (La.1992). This doctrine encompasses “not only spontaneous utterances and declarations made before and after commission of the crime but also testimony
 
 *209
 
 of witnesses and police officers pertaining to what they heard or observed before, during, or after the commission of the crime if the continuous chain of events is evident under the circumstances.”
 
 State v. Molinario,
 
 383 So.2d 345, 350 (La.1980). We have required a close connexity between the charged and uncharged conduct to insure that “the purpose served by admission of other crimes evidence is not to depict the defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.”
 
 State v. Haarala,
 
 398 So.2d 1093, 1098 (La.1981) (emphasis added);
 
 see also
 
 1
 
 McCormick on Evidence,
 
 § 190, p. 799 (4th ed., John William Strong, ed., 1992) (other crimes evidence may be admissible “[t]o complete the story of the crime on trial by placing it in the context of nearby and nearly contemporaneous happenings.”) (footnote omitted). The
 
 res geaste
 
 [sic] or integral act doctrine thus “reflects the fact that making a case with testimony and tangible things not only satisfies the formal definition of an offense, but tells a colorful story with descriptive richness.”
 
 Old Chief v. United States,
 
 519 U.S. 172, 186, 117 S.Ct. 644, 653, 136 L.Ed.2d 574 (1997). The test of integral act evidence is therefore not simply whether the state might somehow 11Sstructure its case to avoid any mention of the uncharged act or conduct but whether doing so would deprive its case of narrative momentum and cohesiveness, “with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict.”
 
 Id.
 

 Davis was charged with and convicted of three counts of armed robbery for robbing patrons inside of the Club Tango bar, and the bar itself. When a marked police unit driven by Officer Mary Colon, with Officer Christopher Russell in the passenger seat, arrived on the scene of the robbery in response to a 911 call, one of the defendant’s accomplices in the robbery, Dwight Patterson, exited the bar and began shooting at the officers. Davis was the second robber to exit the bar, and he stood behind Mr. Patterson before they both fled. At least one bullet penetrated the driver’s side window of the police car. Officer Colon subsequently noticed Officer Russell lying motionless on the ground outside of the police car. When the shooting stopped and the defendant and Mr. Patterson ran away, Officer Colon went around the car to find Officer Russell in a pool of blood. Officer Russell was later pronounced dead at the hospital. Thus, the murder of Officer Russell occurred as the defendant and at least one of his accomplices, Dwight Patterson, were attempting to flee the Club Tango after robbing it and its patrons.
 

 Officer Colon positively identified Davis as the second robber who came from the bar after Mr. Patterson and who stood behind Mr. Patterson momentarily before both of them fled. Officer Colon was one of the two witnesses who identified Davis, the other being Peggy Pritchard, bartender and sister of the owner. In addition, Davis was questioned by homicide detectives in the course of their investigation of the murder of Officer Russell. Both former Detective [uiDemma and former Detective Deal testified at trial. Davis’ confession was given to Detective Deal.
 

 In
 
 State v. Anthony,
 
 427 So.2d 1155 (La.1983), the defendant burglarized an apartment. He left that apartment, went a couple of blocks, and snatched a woman’s purse. He was pursued, and the purse was retrieved. The defendant escaped by going back into the apartment that he had burglarized. There, he armed himself with a knife. He left that apartment and
 
 *210
 
 was seen by an elderly woman, who he then murdered with the knife. The defendant was indicted for first degree murder. He filed a motion to quash, essentially arguing that he could not be charged with first degree murder because the murder was alleged to have occurred during his flight from the scene of an aggravated burglary, not in the course of the aggravated burglary itself. Under La. R.S. 14:30, proscribing the offense of first degree murder, one of the aggravating circumstances making the killing a first degree murder is when the killer is engaged in the “perpetration or attempted perpetration” of,
 
 inter alia,
 
 an aggravated burglary. The trial court granted the motion to quash.
 

 The Court reversed, rejecting the defendant’s argument and finding that a homicide committed during a perpetrator’s flight from an aggravated burglary could constitute first degree murder. In the course of its analysis the Court stated that at trial for any of the offenses involved— the initial burglary, the purse snatching, the second unauthorized entry, or the homicide — “evidence of the other offenses could be admissible as part of the res gestae.”
 
 Anthony,
 
 427 So.2d at 1158.
 

 We find that evidence of the murder of Officer Russell, which occurred as the defendant and his accomplices were fleeing the Club Tango after robbing it and |17its patrons, was related and intertwined with the charged offenses to such an extent that the state could not have accurately presented its case without reference to it. The other crime, wrong, or act must be “ ‘part and parcel’ of the charged crime in that it is an integral part of a larger chain of criminal activity.” Author’s Note (3) to La. C.E. art. 404 B(l), Pugh, Force, Rault & Triche,
 
 Handbook on Louisiana Evidence Law
 
 (2009). Evidence concerning Officer Russell’s murder was an integral part of the larger chain of criminal activity that included the three counts of armed robbery for which Davis was being tried. Therefore, it was admissible as part of the
 
 res gestae
 
 and under La. C.E. art. 404 B(l) as integral act evidence.
 

 Davis further argues that the evidence about the murder of Officer Russell was irrelevant under La. C.E. art. 401, and that even if relevant the evidence should have been excluded under La. C.E. art. 403, because its probative value was substantially outweighed by the danger of unfair prejudice to the defendant.
 

 Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.E. art. 401. Relevant evidence is generally admissible. La. C.E. art. 402. However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. La. C.E. art. 403. Unfair prejudice as used in La. C.E. art. 403 means that “the offered evidence has ‘an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.’ ” Author’s Note (3) to La. C.E. art. 403, Pugh, Force, Rault & Triche,
 
 Handbook on Louisiana Evidence Law
 
 (2009).
 

 A trial court’s ruling as to relevancy will not be disturbed absent a clear abuse of discretion.
 
 State v. Bell,
 
 05-0808, p. 12 (La.App. 4 Cir. 12/6/06), 947 So.2d 774, 781;
 
 State v. Lewis,
 
 97-2854, p. 20 (La.App. 4 Cir. 5/19/99), 736 So.2d 1004, 1017. A trial court is vested with much discretion in determining whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect.
 
 Bell,
 
 supra;
 
 State v. Hall,
 
 02-1098, p. 8 (La.App. 4 Cir. 3/19/03), 843 So.2d 488, 496.
 

 
 *211
 
 Considering that the evidence introduced concerning the murder of Officer Russell and the subsequent investigation of it was so integral to the robberies committed by Davis, his apprehension, and his confession, we do not find that the trial court clearly abused its discretion in implicitly finding it relevant. The evidence was highly relevant.
 

 This court has held that evidence admitted as part of the
 
 res gestae
 
 or as integral act evidence under La. C.E. art. 404 B(l) is subject to the balancing test of La. C.E. art. 403. See
 
 State v. Smith,
 
 94-1502, p. 6 (La.App. 4 Cir.1/19/95), 649 So.2d 1078, 1083 (“It is no longer true that whatever forms part of the res gestae is admissible, and such evidence remains subject to the [art. 403] balancing test.”). The evidence was that Davis did not shoot at Officer Russell, but that one of his accomplices did, without evidence of any instigation from Davis to do so. Considering this fact and the evidence against Davis as to the three counts of armed robbery, we do not find that the trial court abused its discretion in implicitly finding that the probative value of the evidence concerning the murder of Officer Russell admitted at trial was not clearly outweighed by the danger of substantial prejudice to the defendant.
 

 We find no merit to this assignment of error.
 

 ASSIGNMENT OF ERROR NO. 2
 

 119In Davis’ second assignment of error, he argues that the trial court erred in admitting into evidence his confession because it was taken when he was injured, exhausted, and medicated, and he explicitly invoked his right to counsel.
 

 The state initially argues that this court should not consider this issue on appeal because the trial court held a hearing on defendant’s motion to suppress the evidence, denied it, and this court subsequently denied defendant’s application for supervisory review as to that ruling. The state argues, as it did with defendant’s previous assignment of error, that this court’s prior ruling governs as “the law of the case.” However, in denying defendant’s writ application as to the trial court’s denial of defendant’s motion to suppress his confession, this court stated:
 

 WRIT DENIED
 

 Relator’s writ application is denied. He has an adequate remedy on appeal.
 

 State v. Davis,
 
 unpub., 08-0544 (La.App. 4 Cir. 5/8/08).
 

 In denying the defendant’s writ application, this court clearly deferred consideration of the merits of the defendant’s arguments as to his confession to his appeal— in the event he was convicted and sentenced. Accordingly, the “law of the case” doctrine is not a bar to consideration of this assignment of error. Our denial of a writ application, regardless of the reasons assigned for the denial, has no prece-dential value and is a mere statement that the court is declining to review the issues addressed at that time. The relator-in-writ may again raise the issue on appeal.
 

 While the defendant asserts that at the time he gave his confession he was injured, exhausted, and medicated because of the dog bite wound he received from 120a police dog during his apprehension, his argument in this assignment of error is premised on his alleged invocation of his right to counsel.
 

 The record on appeal contains a partial transcript of Davis’ recorded confession, made in the presence of Detective Deal, stating, in pertinent part, as follows:
 

 Q All right. I bring to your attention this yellow form. Would you read me those numbers in the upper, right-hand corner of the form?
 

 A 276961.
 

 
 *212
 
 Q 276961. This is a rights of arrestee or suspect form, and it contains information that advises you of your rights, and we ask you if you wish to give a statement in concern [sic] with this incident that occurred. And if you wish that statement, tell us that that statement is going to be true and correct to the best of your knowledge. Do you understand that?
 

 A Yes, sir.
 

 Q And did I — did we advise you from this form and have you sign it?
 

 A Yes, sir.
 

 Q And did you not sign it in your name, above the words “rights of arres-tee or suspect?”
 

 A Yes, sir.
 

 Q And you’ve signed it of your own free will to say that you would give a statement in this matter?
 

 A Yes.
 

 Q Okay. Did' — were you advised that you need not make any statement; that is, you have the right to remain silent? A Yes, sir.
 

 Q Okay. Anything you say may be used against you in trial.
 

 121A Yes, sir.
 

 Q You have the right to consult with and obtain the advice of an attorney before answering any questions.
 

 A (inaudible)
 

 Q If you cannot afford an attorney, the Court will obtain an attorney to represent you and advise you.
 

 A (inaudible)
 

 Q I can’t hear you.
 

 A Yes, sir.
 

 Q And you have the right to have an attorney or appointed attorney present at the time of questioning and giving of any statements. And you—
 

 A (inaudible) Well, like can I have a attorney (inaudible) at this time.
 

 Q While you give your statement? Do you want to give us a statement at this time concerning this matter?
 

 A Yes.
 

 Q Okay. And you understand what I’ve just advised you?
 

 A Yes, sir.
 

 Q Okay. So would you like — is your statement intended to be true and correct to the best of your knowledge— your — the truth?
 

 A True. It’s going to be true to the best of my knowledge.
 

 Q And would you like to give me that statement?
 

 A Yes, sir.
 

 Q All right. And you’ve sign [sic] this form saying that you would give me a statement that’s true and correct?
 

 122A Yes.
 

 Q All right. Uh, going back to Saturday night or really early Sunday morning, this morning, which was August the 4th at approximately 3 o’clock in the morning. Do you remember where you were?
 

 A Yes. [Emphasis supplied.]
 

 This court set forth the applicable law on the admissibility of inculpatory statements and confessions in
 
 State v. Butler,
 
 04-0880, p. 4 (La.App. 4 Cir. 1/27/05), 894 So.2d 415, 418, as follows:
 

 It is well settled that before the state may introduce an inculpatory statement or confession into evidence, it must affirmatively show that the statement was free and voluntary and not the result of fear, duress, intimidation, menace, threats, inducements, or promises. La.R.S. 15:451; La. C.Cr.P. art. 703(D);
 
 State v. Gradley,
 
 97-0641 (La.5/19/98), 745 So.2d 1160, 1166. The State must prove that the accused was advised of
 
 *213
 
 his
 
 Miranda
 
 rights and voluntarily waived these rights in order to establish the admissibility of a statement made during custodial interrogation.
 
 State v. Green,
 
 94-0887, pp. 9-10 (La.5/22/95), 655 So.2d 272, 280;
 
 State v. Labostrie,
 
 96-2003, p. 5 (La.App. 4 Cir. 11/19/97), 702 So.2d 1194, 1197. A court must look to the totality of the circumstances surrounding the confession to determine its voluntariness.
 
 State v. Lavalais,
 
 95-0320, p. 6 (La.11/25/96), 685 So.2d 1048, 1053. The testimony of police officers alone can be sufficient to prove the defendant’s statements were freely and voluntarily given.
 
 State v. Jones,
 
 97-2217, p. 11 (La.App. 4 Cir. 2/24/99), 731 So.2d 389, 396. [Footnote omitted.]
 

 Whether a statement is voluntary is a fact question; thus, the trial judge’s ruling, based on conclusions of credibility and the weight of the testimony, is entitled to great deference and will not be disturbed on appeal unless there is no evidence to support the ruling.
 
 State v. Byes,
 
 97-1876, pp. 11-12 (La.App. 4 Cir. 4/21/99), 735 So.2d 758, 765;
 
 State v. Parker,
 
 96-1852, pp. 12-13 (La.App. 4 Cir. 6/18/97), 696 So.2d 599, 606.
 

 | asín the ease at bar, Detective Deal testified at a 28 March 2003 evidentiary hearing concerning the defendant’s statement quoted above, or what in the transcription at issue at the evidentiary hearing was the thrust of that statement, with Davis stating: “Yes, well, like, can I have an attorney (inaudible) at this time.” The following colloquy occurred between defense counsel at that time and Detective Deal regarding that statement/question by the defendant:
 

 Q He asked for an attorney at that stage, didn’t he?
 

 A I don’t know if he asked for an attorney or if he repeated after me the question that I’d asked him, that I posed to him.
 

 Q All right. Now this—
 

 A That was my understanding that he — and I’m looking at it again and my appreciation was that he was repeating after me. That was my appreciation.
 

 In
 
 Davis v. United States,
 
 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the defendant, a member of the United States Navy, initially waived his rights to remain silent and to counsel when interviewed by Naval Investigative Service agents in connection with the murder of a sailor. Approximately an hour and a half into the interview, the defendant said: “Maybe I should talk to a lawyer.”
 
 Davis,
 
 512 U.S. at 452, 114 S.Ct. at 2351. However, when the agents asked if he was asking for a lawyer, the defendant said he was not. They took a short break; the defendant was again reminded of his rights; and the interview continued for another hour until the defendant asked to have a lawyer present before saying anything more. A military judge later denied the defendant’s motion to suppress the statement that he made during the interview, holding that his mention of a lawyer was not a request for counsel.
 

 [^Reviewing the defendant’s claims, the United States Supreme Court in Davis stated:
 

 The right to counsel recognized in
 
 Miranda
 
 is sufficiently important to suspects in criminal investigations, we have held, that it “requires] the special protection of the knowing and intelligent waiver standard.”
 
 Edwards v. Arizona,
 
 451 U.S., [477] at 483, 101 S.Ct., [1880] at 1884[, 68 L.Ed.2d 378]. See
 
 Oregon v. Bradshaw,
 
 462 U.S. 1039, 1046-1047, 103 S.Ct. 2830, 2835-2836, 77 L.Ed.2d 405 (1983) (plurality opinion);
 
 id.,
 
 at 1051, 103 S.Ct., at 2838 (Powell, J., concurring in judgment). If the suspect effectively waives his right to counsel
 
 *214
 
 after receiving the
 
 Miranda
 
 warnings, law enforcement officers are free to question him.
 
 North Carolina v. Butler,
 
 441 U.S. 369, 372-376, 99 S.Ct. 1755, 1756-1759, 60 L.Ed.2d 286 (1979). But if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation.
 
 Edwards v. Arizona, supra,
 
 451 U.S., at 484-485, 101 S.Ct., at 1884-1885. This “second layer of prophylaxis for the
 
 Miranda
 
 right to counsel,”
 
 McNeil v. Wisconsin,
 
 501 U.S. 171, 176, 111 S.Ct. 2204, 2208, 115 L.Ed.2d 158 (1991), is “designed to prevent police from badgering a defendant into waiving his previously asserted
 
 Miranda
 
 rights,”
 
 Michigan v. Harvey,
 
 494 U.S. 344, 350, 110 S.Ct. 1176, 1180, 108 L.Ed.2d 293 (1990). To that end, we have held that a suspect who has invoked the right to counsel cannot be questioned regarding any offense unless an attorney is actually present.
 
 Minnick v. Mississippi,
 
 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990);
 
 Arizona v. Roberson,
 
 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). “It remains clear, however, that this prohibition on further questioning-like other aspects of
 
 Miranda
 
 is not itself required by the Fifth Amendment’s prohibition on coerced confessions, but is instead justified only by reference to its prophylactic purpose.”
 
 Connecticut v. Barrett, supra,
 
 479 U.S., [523] at 528, 107 S.Ct., [828] at 832[, 93 L.Ed. 2d 920 (1987)] .
 

 The applicability of the “ ‘rigid’ prophylactic rule” of
 
 Edwards
 
 requires courts to “determine whether the accused
 
 actually invoked
 
 his right to counsel.”
 
 Smith v. Illinois, supra,
 
 469 U.S., [91] at 95, 105 S.Ct., [490] at 492[, 83 L.Ed. 2d 488 (1984)] (emphasis added), quoting
 
 Fare v. Michael C,
 
 442 U.S. 707, 719, 99 S.Ct. 2560, 2569, 61 L.Ed.2d 197 (1979). To avoid difficulties of proof and to provide guidance to ^officers conducting interrogations, this is an objective inquiry. See
 
 Connecticut v. Barrett, supra,
 
 479 U.S., at 529, 107 S.Ct., at 832. Invocation of the
 
 Miranda
 
 right to counsel “requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.”
 
 McNeil v. Wisconsin,
 
 501 U.S., [171] at 178, 111 S.Ct., [2204] at 2209[, 115 L.2d 2d 158 (1991)] . But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect
 
 might
 
 be invoking the right to counsel, our precedents do not require the cessation of questioning. See
 
 ibid.
 
 (“[T]he
 
 likelihood
 
 that a suspect would wish counsel to be present is not the test for applicability of
 
 Edwards
 
 ”);
 
 Edwards v. Arizona, supra,
 
 451 U.S., at 485, 101 S.Ct., at 1885 (impermissible for authorities “to reinterrogate an accused in custody if he has
 
 clearly asserted
 
 his right to counsel”) (emphasis added).
 

 Rather, the suspect must unambiguously request counsel. As we have observed, “a statement either is such an assertion of the right to counsel or it is not.”
 
 Smith v. Illinois,
 
 469 U.S., at 97-98, 105 S.Ct., at 494 (brackets and internal quotation marks omitted). Although a suspect need not “speak with the discrimination of an Oxford don,”
 
 post,
 
 at 2364 (SOUTER, J., concurring in judgment), he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity,
 
 Edwards
 
 does not require that the officers stop ques
 
 *215
 
 tioning the suspect. See
 
 Moran v. Burbine,
 
 475 U.S. 412, 433, n. 4, 106 S.Ct. 1135, 1147, n. 4, 89 L.Ed.2d 410 (1986) (“[T]he interrogation must cease until an attorney is present
 
 only
 
 [i]f the individual states that he wants an attorney”) (citations and internal quotation marks omitted).
 

 We decline petitioner’s invitation to extend
 
 Ediuards
 
 and require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney. See
 
 Arizona v. Roberson, supra,
 
 486 U.S., at 688, 108 S.Ct., at 2101-2102 (KENNEDY, J., dissenting) (“[T]he rule of
 
 Edwards
 
 is our rule, not a constitutional command; and it is our obligation to justify its expansion”). The rationale underlying
 
 Edwards
 
 is that the police must respect a suspect’s wishes regarding his right to have an attorney present during custodial interrogation. But when the |2f,officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning “would transform the
 
 Miranda
 
 safeguards into wholly irrational obstacles to legitimate police investigative activity,”
 
 Michigan v. Mosley,
 
 423 U.S. 96, 102, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975), because it would needlessly prevent the police from questioning a suspect in the absence of counsel even if the suspect did not wish to have a lawyer present. Nothing in
 
 Edwards
 
 requires the provision of counsel to a suspect who consents to answer questions without the assistance of a lawyer. In
 
 Miranda
 
 itself, we expressly rejected the suggestion “that each police station must have a ‘station house lawyer’ present at all times to advise prisoners,”
 
 [Miranda v. State,]
 
 384 U.S., [436] at 474, 86 S.Ct., [1602] at 1628, [16 L.Ed.2d 694 (1966)] and held instead that a suspect must be told of his right to have an attorney present and that he may not be questioned after invoking his right to counsel. We also noted that if a suspect is “indecisive in his request for counsel,” the officers need not always cease questioning. See
 
 id.,
 
 at 485, 86 S.Ct., at 1633.
 

 We recognize that requiring a clear assertion of the right to counsel might disadvantage some suspects who-because of fear, intimidation, lack of linguistic skills, or a variety of other reasons-will not clearly articulate their right to counsel although they actually want to have a lawyer present. But the primary protection afforded suspects subject to custodial interrogation is the
 
 Miranda
 
 warnings themselves. “[F]ull comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process.”
 
 Moran v. Burbine, supra,
 
 475 U.S., [412] at 427, 106 S.Ct., [1135] at 1144 [, 89 L.Ed 2d 410 (1986)]. A suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted. Although
 
 Edwards
 
 provides an additional protection-if a suspect subsequently requests an attorney, questioning must cease-it is one that must be affirmatively invoked by the suspect.
 

 In considering how a suspect must invoke the right to counsel, we must consider the other side of the
 
 Miranda
 
 equation: the need for effective law enforcement. Although the courts ensure compliance with the
 
 Miranda
 
 requirements through the exclusionary rule, it is police officers who must actually decide whether or not they can question a
 
 *216
 
 suspect. The
 
 Edwards
 
 rule-questioning must cease if the suspect asks for a 127lawyer-provides a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information. But if we were to require questioning to cease if a suspect makes a statement that
 
 might
 
 be a request for an attorney, this clarity and ease of application would be lost. Police officers would be forced to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong. We therefore hold that, after a knowing and voluntary waiver of the
 
 Miranda
 
 rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney.
 

 Davis,
 
 512 U.S. at 458-461, 114 S.Ct. at 2354-2356.
 

 In
 
 State v. Bell,
 
 07-1124 (La.6/29/07), 958 So.2d 1173, midway through questioning by police, when it appeared they did not believe the exculpatory account the defendant was providing them, the defendant stated: “I’d rather wait until my mom get me a lawyer then. Because I’m telling you what I know, and you’re trying to make me tell you other.” 07-1124, p. 1, 958 So.2d at 1174. Police reinitiated conversation with the defendant immediately thereafter. The lead investigating officer urged the defendant to refocus his attention, as the defendant argued with the other officer present over a seemingly collateral point, and ultimately steered the defendant into making additional statements about the subject matter of the investigation. The defendant finally brought the interview to an end by reiterating his desire to speak with “my lawyer,” i.e., the attorney that his mother would secure for him. The trial court denied the defendant’s motion to suppress the statement. The Louisiana First Circuit Court of Appeal denied relief. The Louisiana Supreme Court granted writs, finding that the defendant spoke with sufficient clarity such that “a reasonable police officer in the circumstances would understand the statement to be a request for an attorney,” citing Davis supra.
 

 Lain the case at bar, as in
 
 Davis, supra,
 
 the defendant had already been advised of his rights, including his right to remain silent and his right to counsel, and he had already waived them by signing the waiver of rights form before asking about an attorney. Considering the totality of the circumstances — that Davis had waived his rights, the wording and context of Davis’ subsequent question about counsel, and Detective Deal’s evidentiary healing testimony concerning that question — that which Davis argues was an “unmistakable” invocation of his right to counsel was in our view in fact ambiguous and equivocal in that a reasonable officer in light of the circumstances would at most have understood only that defendant “might be” invoking his right to counsel, as in
 
 Davis, supra.
 
 Therefore, we do not find that the trial court abused its discretion in determining that Davis had not affirmatively and unambiguously invoked his right to counsel, and that the state had established that Davis’ statement was free and voluntary and not the result of fear, duress, intimidation, menace, threats, inducements, or promises.
 

 No merit exists in this assignment of error.
 

 CONCLUSION
 

 For the foregoing reasons, the convictions and sentences of Michael Davis are affirmed.
 

 AFFIRMED.
 

 [1]
 

 . Davis was jointly charged with Bradley Armstrong. On 17 August 2005, the state elected to try Davis before Mr. Armstrong. On 11 December 2006, Mr. Armstrong pleaded guilty as charge to all four counts and was sentenced.
 

 [2]
 

 . In two pretrial matters and one post-trial matter, this court granted one writ and denied two others filed by Davis as to issues that are unrelated to the issues presented by this appeal.
 
 State v. Davis,
 
 unpub., 06-0930 (La.App. 4 Cir. 7/31/06)(writ denied);
 
 State v. Davis,
 
 unpub., 06-1637 (La.App. 4 Cir. l/l/07)(writ granted);
 
 State v. Davis,
 
 unpub., 08-0564 (La.App. 4 Cir. 6/17/08)(writ denied).
 

 [3]
 

 . On 4 January 2008, this court denied Davis’ writ application as to the denial of his motion in limine in this matter.
 
 State v. Davis,
 
 unpub., 08-0012 (La.App. 4 Cir. 1/4/08).
 

 [4]
 

 . On 8 May 2008, this court denied Davis' writ application seeking review of the denial of his motion to reconsider his motion to suppress the statement.
 
 State v. Davis,
 
 unpub, 08-0544 (La.App. 4 Cir. 5/8/08).
 

 [5]
 

 . At the sentencing/ habitual offender hearing the trial court acknowledged that it would refer to original Counts Two, Three, and Four, for which Davis was tried and convicted, as Counts One, Two, and Three, respectively.
 

 [6]
 

 .
 
 State v. Davis,
 
 unpub., 08-0012 (La.App. 4 Cir. 1/4/08).
 

 [7]
 

 . Under La. C.E. arL. 404 B(l), evidence of other crimes, wrong, or acts may be admissible when such evidence relates to "conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.”