STATE OF LOUISIANA           \*         NO. 2024-KA-0385

VERSUS                  \*

                                COURT OF APPEAL

CHRISTOPHER WHITE     \*

                                FOURTH CIRCUIT

                    \*

                                STATE OF LOUISIANA

              \* \* \* \* \* \* \*

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 555-405, SECTION "E"
Judge Rhonda Goode-Douglas,
\* \* \* \* \* \*
**Judge Rosemary Ledet**
\* \* \* \* \* \*

(Court composed of Chief Judge Roland L. Belsome, Judge Rosemary Ledet, Judge Rachael D. Johnson)

**BELSOME, C.J., CONCURS IN PART; DISSENTS IN PART**

JASON R. WILLIAMS
District Attorney
Parish of Orleans
Brad Scott
Assistant District Attorney
619 South White Street
New Orleans, LA 70119

      COUNSEL FOR THE STATE OF LOUISIANA/APPELLANT

Sherry Watters
LOUISIANA APPELLATE PROJECT
P. O. Box 58769
New Orleans, LA 70158

      COUNSEL FOR DEFENDANT/APPELLANT

                                **VACATED IN PART;**
                                **AFFIRMED IN PART**
                                **May 14, 2025**

*RML*

*RDJ*

Defendant, Christopher White, was convicted of second degree murder, obstruction of justice, and human trafficking. Mr. White was sentenced to life imprisonment for second degree murder, and thirty years each for obstruction of justice and human trafficking, to be served concurrently.

Mr. White contends there was insufficient evidence to convict. He also contends the district court: 1) erred by denying his motion to quash; 2) made numerous evidentiary errors; and 3) excessively sentenced Mr. White for the obstruction of justice and human trafficking charges.

Upon review, we find sufficient evidence was presented to find Mr. White guilty of second degree murder and human trafficking. But, due to the lack of evidence of intent relating to obstruction of justice, we find insufficient evidence was presented to support a conviction, and vacate the obstruction of justice conviction and sentence. Moreover, we find Mr. White's motion to quash was correctly denied by the district court, as he failed to demonstrate the prosecution attempted to gain an unfair advantage. Further, our review of Mr. White's trial did

not reveal problematic evidentiary rulings, aside from harmless errors. Lastly, we find Mr. White's sentence for human trafficking was not excessive given the facts presented. As such, we vacate Mr. White's conviction and sentence for obstruction of justice. In all other respects, we affirm Mr. White's convictions and sentences.

## FACTUAL BACKGROUND

Mr. White was working as a pimp in 2017, when he met D.M. and C.P.[1] D.M. and C.P. began working as prostitutes and thieves on behalf of Mr. White. After the classified ad website, Backpage, utilized by Mr. White, was shut down, he, D.M., C.P., and another unidentified woman relocated their base of operations to New Orleans. Mr. White maintained differing locations for the women to sleep/rest, but required them to walk different parts of the French Quarter and Central Business District to either find clients for sexual services or people to potentially rob.

In 2018, D.M. and C.P. were attacked on separate occasions. D.M. was robbed and knocked out, while C.P. remained conscious and fought back. Mr. White asked D.M. and C.P. to inform him if they saw the person who attacked them and send him a photograph. On October 24, 2018, in the early morning hours, D.M. and C.P. were walking in the French Quarter when they spotted Charles Lee. C.P. identified Mr. Lee as her attacker based upon his voice. C.P. and D.M. telephoned Mr. White to let him know. Mr. White drove to their location. Mr. White then engaged in a verbal altercation with Mr. Lee. Mr. White began shooting, striking Mr. Lee four times and killing him. Mr. Lee's passenger,

---

[1] Pursuant to La. R.S. 46:1844(W)(1)(a) and (W)(2)(a), we utilize the initials "of victims of sex offenses or human trafficking-related offenses."

later identified as Keilon Washington,[2] fled the scene.  Mr. White also left the scene and eventually drove to Florida, where he was arrested approximately one month after the shooting.

## PROCEDURAL HISTORY

On May 10, 2019, in case number 543-559, the State of Louisiana ("State") charged Mr. White with attempted second degree murder in violation of La. R.S. 14:(27)30.1, and second degree murder of Mr. Lee in violation of La. R.S. 14:30.1. Three years later, the State filed a motion to continue the trial, which the district court denied.  On September 6, 2022, the date the matter was set for trial, the State reurged its motion to continue, which the district court denied.  Thereafter, the State entered a *nolle prosequi* and noted that it had already filed a bill of information re-charging Mr. White.  The bill of information, filed August 29, 2022, in case number 555-321, charged Mr. White with manslaughter in violation of La. R.S. 14:31 and attempted second degree murder.

On September 8, 2022, Mr. White was charged by bill of indictment in case number 555-405 (the case presently on appeal), with one count of second degree murder pursuant to La. R.S. 14:30.1, one count of obstruction of justice in violation of La. R.S. 14:130.1, and one count of human trafficking (of D.M. and C.P.) in violation of La. R.S. 14:46.2.  On September 13, 2022, the State entered a *nolle prosequi* to the manslaughter and attempted second degree murder charges set forth in case number 555-321.  One month later, Mr. White pled not guilty to the charges (second degree murder, obstruction of justice, and human trafficking) lodged against him.

---

[2] In the trial transcript, the passenger in Mr. Lee's vehicle was referred to as "Kelon" Washington.  However, in the parties' briefs, Mr. Washington's first name is spelled as "Keilon."

3

The following month, Mr. White filed a motion to quash the indictment based on the State's alleged "manipulation of the charges to avoid the [district] court's rulings [denying the State's motions to continue the trial in the original action (case number 545-559)]." On January 6, 2023, the district court denied Mr. White's motion to quash. In connection with the district court's adverse decision, Mr. White filed a writ application in this Court, which was denied. *See State v. White*, 2023-0124 (La. App. 4 Cir. 3/9/23) (unpub'd order).

A jury trial commenced, and the jury found Mr. White guilty on all three counts of the indictment. Mr. White's motion for new trial followed. After denying Mr. White's motion for new trial, the district court heard victim-impact statements, along with a statement from Mr. White. The district court then rendered its sentence.

With respect to count one, second degree murder, the district court imposed the mandatory sentence of life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. In connection with count two, obstruction of justice, the district court sentenced Mr. White to thirty years imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. Finally, with respect to count three, human trafficking, the district court sentenced Mr. White to thirty years imprisonment at hard labor. The district court specified that the sentences were to be served concurrently. Thereafter, the district court confirmed that Mr. White had already filed a motion for appeal.[3]

---

[3] On February 21, 2025, this Court received Mr. White's pro se request for his trial transcript for the purpose of preparing a pro se supplemental appeal brief. On February 27, 2025, the Court ordered that the appellate record be sent to Davis Wade Correctional Center in Homer, Louisiana (where Mr. White is in custody) and that Warden Michell Dauzat be appointed custodian of the appellate record. Upon receipt of the appellate record, Warden Dauzat was "ordered to furnish the record to Mr. White." It was further ordered "that Mr. White is granted until March 12, 2025, to file a pro se supplemental brief with this Court." *State v White*, 2024-0385 (La. App. 4

4

## ERRORS PATENT

A review of the record reveals one patent error. When imposing a sentence in connection with count two, obstruction of justice, the district court sentenced Mr. White to thirty years imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. La. R.S. 14:130.1(B)(1) provides that a sentence for obstruction of justice in a case such as this, when the obstruction "involves a criminal proceeding in which a sentence of death or life imprisonment may be imposed . . . the offender shall be . . . imprisoned for not more than forty years at hard labor . . ."; however, the statute does not prohibit eligibility for probation, parole, or suspension of sentence. But, because we vacate Mr. White's conviction for obstruction of justice, we need not correct this sentence.

## TRIAL TESTIMONY AND EVIDENCE

### Detective Michael Poluikis

Detective Michael Poluikis, a New Orleans Police Department ("NOPD") homicide detective, testified that he served as the lead investigator regarding Mr. Lee's murder, which occurred in the 700 block of Iberville Street. As part of his investigation, he obtained video footage from a Real Time Crime Center ("RTCC") camera which was published to the jury. The video showed Mr. Lee's vehicle stopped in the street and also captured Mr. White shooting Mr. Lee.[4] Thereafter, video footage from Mr. B's restaurant was introduced into evidence and published to the jury. This footage, divided into numerous short segments, depicted vehicles and persons passing through the area where the shooting took

---

Cir. 2/27/25) (unpub'd order). On March 18, 2025, the Court granted Mr. White an extension until April 1, 2025, to file his supplemental brief. *State v White*, 2024-0385 (La. App. 4 Cir. 3/18/25) (unpub'd order). Mr. White failed to submit his pro se brief.

[4] We utilize the parties' names in describing the videos, as the identity of the shooter and victim in the videos is undisputed.

5

place. Next, video footage from the Penthouse Club was introduced into evidence and played for the jury. This exhibit depicted police arriving on the scene, but the actual shooting was not shown. The video footage from Dickie Brennan's restaurant, which was published to the jury, depicted the rear of a vehicle blocking the street and cars blocked behind it. The video showed Mr. White walking up to one of the blocked vehicles and as the driver's door to the blocked vehicle was opened, he fired a weapon at Mr. Lee while Mr. Lee was opening the car door. Mr. White fled (presumably going back to the car that was blocking the street) and shortly thereafter the car blocking the street was moved and other cars exited the area. Mr. Lee's car did not move. There were two passengers in that vehicle. One passenger, who was in the back seat, left the scene. A man who was in the front passenger seat, walked around to the driver's side of the vehicle, looked inside the car on the driver's side, then returned to the front passenger side and, thereafter, exited the scene.[5] Forensic testing revealed that all of the bullets were fired from the same weapon. No evidence of a weapon was found in Mr. Lee's vehicle.

Det. Poluikis testified that he met with Mr. Washington, who was scared and uneasy about speaking with police. Det. Poluikis stated he never had reason to suspect Mr. Washington committed a crime or that he removed evidence from the scene. After meeting with Mr. Washington, Det. Poluikis applied for an arrest warrant for second degree murder for Mr. White. Thereafter, Mr. White and C.P. were later arrested in Florida. After Mr. White's arrest, Det. Poluikis spoke with Detective Clifford Turnquest from the Seminole Police Department, who mailed

_____

[5] Following the Dickie Brennan's video, which depicted the shooting, the State entered into a stipulation with the defense that the video from Acme Oyster House was "grainy" and did not "really show anything of substance." A review of the video reflects that the State's stipulation as to the quality of the video and its lack of substantive evidence was accurate. Nonetheless, the video was published to the jury.

Det. Poluikis the cell phones and iPad collected as part of an executed search warrant.

On cross-examination, Det. Poluikis noted that the videos of the shooting did not reflect whether Mr. Lee and Mr. Washington were armed and did not show what transpired inside Mr. Lee's vehicle. However, he stated that Mr. Lee's vehicle did not roll forward after the shooting, which implied Mr. Lee had placed the vehicle in park. The woman in the vehicle with Mr. Lee and Mr. Washington was never identified. Further, Det. Poluikis stated that he never spoke with D.M. or C.P. Also, no gunshot residue tests were conducted on Mr. Lee or Mr. Washington.

With regard to the Penthouse Club video (specifically, the first video of the six received from the Penthouse Club), Det. Poluikis confirmed that the man in the red pants, getting inside the parked car located on the right side of the street, was Mr. Lee. He testified, and the video showed, a slight dark discoloration at the top right-side of the back of Mr. Lee's red pants. Det. Poluikis could not speculate as to the cause of the discoloration. Based on another angle of the videos from the Penthouse Club, Det. Poluikis testified, and the video showed, Mr. Washington, after the shooting as he is leaving the scene, place "his left hand on his upper left hamstring area."

On redirect, Det. Poluikis reiterated that Mr. Washington's interview was consistent with all of the video evidence recovered and that he had no indication Mr. Washington was untruthful. Det. Poluikis testified that pursuant to his investigation, specifically, his questioning of Mr. Washington, he learned that Mr. Washington, following the shooting, went to the driver's side of Mr. Lee's vehicle to check on his friend and to try to move him to the passenger seat so he could

7

drive Mr. Lee to the hospital. There was no evidence that a gun was fired inside Mr. Lee's vehicle and no allegation Mr. Lee fired a gun. Overall, Det. Poluikis testified that there was no reason to believe Mr. Lee had a gun, fired a gun, or displayed a gun.[6]

### *Detective Clifford Turnquest*

Det. Turnquest works with the Seminole Police Department ("SPD") in Hollywood, Florida. On November 13, 2018, he participated in an investigation wherein Mr. White and C.P. were arrested in a black Mercedes Benz at a Days Inn Hotel in Florida. After executing a search warrant on the Mercedes, he recovered four cell phones and an iPad, which were placed into evidence. All of the phones and the iPad were sent to New Orleans.

Det. Turnquest stated that D.M. was also present at the time of Mr. White's arrest. However, he believed D.M. drove away. While Det. Turnquest did not speak with either D.M. or C.P., his partner did. Det. Turnquest was not a part of the NOPD's investigation and the SPD investigation did not involve sex trafficking.

### *D.M.*

D.M. testified that she was born on July 8, 1997, and met Mr. White in 2017 in Nashville, Tennessee, through an internet site called Backpage, when she was looking for marijuana. She was already working as an escort, but began working for Mr. White a week or two after meeting him. As to her motives, she stated, "I was already in a really bad situation with somebody else, and he made it seem like everything was going be much better, that it wouldn't be any violence, just living

---

[6] Following C.P's testimony, Det. Poluikis was later called back to the witness stand in order to identify and introduce Mr. Lee's clothing items, the cell phones, and the iPad into evidence.

conditions, actually, being able to have things taken care of for us." D.M. emphasized that Mr. White made her feel like she would no longer "have to worry about someone putting their hands on me anymore."

The first time Mr. White was physically violent with D.M. they were in Dallas, Texas. D.M. had not slept due to working for nearly two days straight, and Mr. White was angered when she fell asleep. She stated, "I went into the bathroom and he pushed through the door, which ended up pushing me into the bathtub, and he broke my phone and left me there." D.M. described another time Mr. White was violent in Alabama wherein:

> I said something, and he didn't like it. And he turned around and he punched me in my face, and then he threw my phone at my face. My nose was messed up. I had two black eyes. My lips were busted, and then he left me there. And then eventually he did get me a hotel room, and I kind of just stayed there. But that's also one of those situations where, you know, he would be violent, and then turn around and do something nice because he was intimate with me after that too. He was constantly saying he was sorry, and then he left.

D.M. maintained that Mr. White threatened her more than ten times over the course of two years. D.M. observed Mr. White throw a bottle at C.P.'s head.

D.M. explained that Mr. White understood she could not "handle" being alone, so that when she failed to bring him the amount of money he wanted, he would purposefully leave her alone. Mr. White's "threats were typically to leave me completely alone knowing that I couldn't handle that. I was extremely co-dependent on him, extremely co-dependent on him. I feel like I couldn't even breathe if he wasn't around." Further, D.M. stated, "[w]henever it came to not making what we needed to make, you know, it was just always just attitudes and fights and certain things we just couldn't get or do. And most, in my case, just really being left alone, knowing that I couldn't handle that." D.M. testified that

Mr. White knew both of her biological parents abused her and that she was eventually placed in the foster care system growing up.

All of the money D.M. made went to Mr. White. When she needed clothes or food, she would have to ask Mr. White. While D.M. had a bank account, Mr. White would retain the bank cards in order to have access to the funds. Additionally, Mr. White usually made them use his birthday as their PIN numbers. When D.M. brought Mr. White what he deemed to be sufficient income or exceeded her daily requirement, she stated that Mr. White would reward her with sex and intimacy as follows: "[s]ometimes, one of the most common things in my situation, or for me, was the use of intimacy and sex because I was very — I don't even know how to put this. I don't want to say needy, but I was very deprived of affection and just love in general. So if I did good, then that's what I would get."

Once Backpage was shut down, around April 2018, Mr. White, D.M., C.P., and another unidentified woman moved their base of operations to New Orleans, mainly, the French Quarter. In New Orleans, Mr. White's "girls" earned more money. D.M. stated this seemed to make Mr. White "greedier," and he expected "more and more and more." She testified that the girls "really didn't get any breaks at all." If she had not met her "daily trap,"[7] she would likely be locked out until "after [she spent] a good while outside."

D.M. testified that she did not stop working for Mr. White because she had no place to go, no vehicle, no apartment, and no control of the money she earned. She also stated that had no one to talk to about her situation.

On October 24, 2018, D.M. and C.P. were working as prostitutes on

---

[7] D.M. testified that the "daily trap" was the minimum amount Mr. White expected her to make each day.

Bourbon Street in the early morning hours. Mr. White was driving around in his Maserati Ghibli. While they were walking, C.P. suddenly "stopped and froze" at the corner of Bourbon Street and Iberville because C.P. heard a voice that sounded like the man that previously assaulted both she[8] and C.P. That man was Mr. Lee. D.M. never saw Mr. Lee hit C.P. or her.

Mr. White had instructed them to call him if they crossed paths with the man who assaulted them. Following these instructions, D.M. and C.P. called Mr. White and gave him their location. Mr. White drove to their location and asked repeatedly if they were sure Mr. Lee was the man who assaulted them. After indicating that they were unsure, Mr. White pulled out his gun and shot at Mr. Lee and the vehicle Mr. Lee was driving. After the shooting, D.M. testified that she froze and C.P. had to drag her to a parking garage.

D.M. stated that she believed Mr. White would just attempt to physically assault or "beat up" Mr. Lee, stating: "[The] [l]ast thing we expected was for him [defendant] to pull out his gun and shoot into the car. If I had known, I never would have called him." Once Mr. White, D.M., and C.P. gathered after the shooting, they travelled to Lake Charles, Houston, Little Rock, Jacksonville, and Miami. She was present in Miami when Mr. White and C.P. were arrested. D.M. stated that she never called the police because she was scared she would be next.

The State played two jail house telephone calls between Mr. White and D.M. The calls demonstrate that Mr. White was attempting to get a message to C.P. about helping him. He told D.M. that "he ain't [sic] going out like this." Mr.

---

[8] D.M. stated she was attacked four to eight weeks prior to the shooting and explained, "I don't know exactly what happened. I just know that I was walking after I had a client, and I got hit from the back. I was knocked out. I had my things taken. That's all I remember."

White was frustrated because he believed D.M. and C.P. were not doing enough to help him. Mr. White asked for an attorney's contact information and threatened to give detectives information that would make the police arrest D.M. and C.P. Mr. White stated, "they gonna find you."

On cross-examination, D.M. stated that her relationship with Mr. White was a mixture of a professional and an emotional arrangement. She also testified that she loved Mr. White. D.M. indicated that C.P. had taken a large sum of money that was saved to assist Mr. White with a lawyer. D.M. also admitted that Mr. White did not kidnap her, force her to work with him, or threaten her with violence if she chose not to work with him. Mr. White never threatened her with a gun. However, she did hear Mr. White threaten another man with a gun over the phone.

D.M. stated that while she did not know Mr. Lee personally, because he was on the streets of the French Quarter and "the way he was yelling at us before everything [the shooting] went down," she believed he was also a pimp. D.M. stated that from her vantage point, she could not see Mr. Lee in his car and could not see if he was armed, but she "assume[d]" that he was.

On redirect, D.M. testified that she believed Mr. White psychologically manipulated her.

### Dr. Samantha Huber

Dr. Samantha Huber testified that she is the Chief Forensic Pathologist for the Orleans Parish coroner's office and became the Deputy Chief Coroner in 2020. Dr. Huber was accepted as an expert in forensic pathology. She performed Mr. Lee's autopsy. Dr. Huber observed four gunshot wounds and determined that Mr. Lee's cause of death was multiple gunshot wounds. There was no indication of the range of the gunfire, as in the distance of Mr. Lee from the gun. However, there

12

was also no indication the gunshots were "close range." No gunshot residue tests were ordered. Dr. Huber testified that Mr. Lee's toxicology report was not relevant to the cause of manner of his death.

***Sean McElrath***

Sean McElrath, an expert in the field of firearm identification, is the section head of the forensic firearm section for the NOPD crime lab. Mr. McElrath opined that six .9 millimeter cartridges recovered from the scene were fired from the same weapon. He further opined that the seventh projectile recovered from the scene did not lend any information.

***C.P.***

C.P. testified that she was born on November 28, 1997, and met Mr. White on Tinder after ending a bad relationship and losing her job, where she had been working for a Nissan company in a warehouse office. C.P. spoke with Mr. White for about two weeks before meeting him in person. The same night she met Mr. White, C.P. stated that she started making money, as he instructed. She did not have sexual intercourse with people for money prior to this meeting, but Mr. White told her he could teach her how to make money. C.P. testified that her photos were placed on Backpage in ads and she would meet clientele in that manner. All of the money she made was given to Mr. White. Mr. White would then provide her the necessities. Her nickname was "Snow."

C.P. testified that Mr. White prepared guidelines and rules of behavior that she was directed to follow. She had a copy of these rules on her cell phone.[9] She

_____

[9] Mr. White's rules were as follows:

1. No [s]leeping before daily trap is made.

further explained that she contemplated leaving Mr. White, but he had control of her car keys, her identification, and her bank card. Plus, she did not have anywhere else to go.

C.P. and Mr. White did not get along very well, and there was "a lot of

---

2. You are required to text back tricks promptly and respond to ALL missed calls as soon as possible.

3. You are required to answer your phone when Mr. White calls or texts. If you're on a date call back as soon as you're done[.]

4. No back talking Mr. White. Even if you think you're right you're wrong unless Mr. White considers otherwise.

5. Never speak while Mr. White is speaking.

6. Never talk s**t about Mr. White or any other Angel[.]

7. There is no room for excuses here, you come to boss up and follow my guidance and instructions and become an Angel or you're fired.

8. If you leave Chachi's Angels you can not [sic] come back.

9. We are a team we eat together we work together we pray together we enjoy life together.

10. You must be able to follow directions.

11. You must be able to listen.

12. You must be able to get along with others.

13. Communication with any other Pimp is not Angel behavior and won't be tolerated.

14. We are a Brand [sic]. No misrepresentation of this brand will be tolerated.

15. No talking about what goes on between Chachi's Angels with any outsider.

16. If you have a problem with anything or anybody contact Mr. White . . . and if unavailable leave a message and He will get back to you ASAP.

17. You are required to bring in 500$ minimum daily to be an Angel.

18. You are required to advertise Chachi's Angels everyday via posts pictures or the name and logo itself.

19. Any Advertisement photos taken by Mr. White or while under Chachi's Angels management will be added to your individual portfolio, and kept by Mr. White. In such cases of a termination, dismissal, leave of absence, your photos will not be used for any further representation of Chachi's Angels and will be available for purchase back to the model of which the photo was taken. Photos will only be kept 30 days after separation from Chachi's Angels and will be deleted afterwards. (Emoticons omitted).

tension." According to C.P., other women created tension to the point where she no longer wanted to remain. However, she felt like she had nothing else to do. Mr. White required her to work outside the casino, as she was under twenty-one she could not enter, as well as the French Quarter. Once she was assaulted by another pimp. He struck her on the head, but she fought back. The pimp threw her belongings all over the street and kicked her numerous times before leaving the scene. She told Mr. White what transpired, and he instructed her to send a picture if she saw the pimp again.

On October 24, 2018, while walking with D.M., she spotted Mr. Lee and believed he was the pimp who attacked her. She could not remember if she or D.M. called Mr. White. However, Mr. White drove to their location. She stated that Mr. White began arguing with Mr. Lee and shots were fired. C.P. testified that she did not call the police after the shooting because Mr. White was all she had.

As to Mr. White's propensity for violence, C.P. stated:

> There were a few instances. There was one — there was an incident where he had said that I had brushed passed him, and he threw a shampoo bottle at me and hit me in the head. There was another instance he had seen me walking with another female on Bourbon Street and he had me come and meet up with him over — close to the casino and things got physical from there. And then he ended up taking me back to the hotel. He left me there, and he went to Florida. It would just be instances like that. He would just lose his temper, and then he would kind of just leave me alone for a little bit, and then he would text or call or apologize, or we would go out after that, and he would kind of try to make it up to me, so to say.

Further, when it came to threats, C.P. testified, "[i]t was a good-day bad-day situation. Any split thing could change his whole mood, his whole demeanor. It could be something that was my fault, something that wasn't my fault. It was just kind of like you got to be careful about what you say or do."

C.P. admitted that Mr. White could be controlling. For example,

There was one point I had spoken to another girl that was around about leaving, and she had told him. And it kind of just — it never happened. I told him that I wanted to go home to see my mom because she was sick, which wasn't true. I had lost my apartment. Upon leaving Tennessee and going to Florida, he kept controlling my car keys. He had my I.D. and my bank card for most of the beginning of our relationship, and I just — I didn't have a relationship with my family anymore. I didn't have anywhere to go. I just — I stayed. I had nothing else.

C.P. stated that she had a certain quota, in terms of money, that she was expected to bring in each night, which was anywhere from $700.00 to $1200.00. C.P. testified that if you had a "bad night" earnings wise, Mr. White, "would make you feel bad about it. He would talk down on you. He would not spend time with you or whatever the case may be, kind of just made you feel guilty for it and made him angry." Conversely, if you performed well, Mr. White "would spend time with you. He would say take you to buy new clothes, or you-all would get food together. You would spend the day with him whenever you come and bring him the money he would stay with you in bed, have sex with you, I guess. Reward you in that way, to say the least."

As to C.P.'s homelife, her parents left when she was sixteen; she did not see them again until she graduated from high school. Her family ceased contact with her after discovering she was working for Mr. White. Only her sister would speak with her.

On cross-examination, C.P. admitted that Mr. White never asked her to lie for him. She stated that Mr. White did not force her to go with him, bribe her, or kidnap her.

At the scene of the shooting, she believed Mr. Lee was confused. Further, C.P. stated that Mr. Lee, at the time of the shooting, never exited his vehicle; he "just opened the door." She reiterated that she never saw a weapon in Mr. Lee's

possession, explaining: "I didn't really see anything other than the door open and then shots were fired." C.P further testified that she did not see a weapon in the passenger's hands; she "wasn't aware that there was a passenger until the news story came out."

### *Detective Eddie Williams*

Detective Eddie Williams from the NOPD digital forensics unit was accepted as an expert in digital forensics. Det. Williams testified regarding the cell phones and iPad recovered from the search warrant in Florida when Mr. White was arrested.[10] Det. Williams testified that he did not know how many people had access to the devices.

### *Shareet Butler*

Ms. Butler, a cousin of Mr. Lee's, testified as to how his murder impacted the family. She stated that Mr. Lee was around her for most of his life, since the age of three. She testified with respect to the acute loss the family had experienced as a result of Mr. Lee's death. Following Ms. Butler's testimony, the State rested; and the defense, without calling any witnesses, also rested.

## INSUFFICIENT EVIDENCE

Mr. White contends that there was insufficient evidence to support his convictions. With regard to his second degree murder conviction, Mr. White asserts that the State "failed to meet the burden to negate self-defense." He also maintains that because the justification defense invalidates his second degree murder conviction, his obstruction of justice conviction should be reversed since

---

[10] Device 2 had an Apple ID of Christopherwhite92@gmail.com. Device 3 had an Apple ID of snowdoe@iCloud.com. Device 4's Apple ID was bsweets0922@yahoo.com. Device 5, a Samsung phone, was attributed to a "Diamond Sweets." Device 1, an iPad, was labeled as Snow's iPad.

there was no crime to obstruct. Finally, Mr. White maintains that the State failed to prove all the necessary elements to sustain the human trafficking conviction.

"Under Louisiana jurisprudence, when a defendant presents issues of alleged errors at trial and overall sufficiency of the evidence for review under *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the insufficiency of the evidence claim is addressed first." *State v. Gibson*, 2015-0682, p. 12 (La. App. 4 Cir. 1/27/16), 186 So.3d 772, 780 (citing *State v. Marcantel*, 2000-1629, p. 8 (La. 4/3/02), 815 So.2d 50, 55). Generally, when assessing the sufficiency of evidence to support a conviction, the reviewing court must determine whether, "viewing the evidence in the light most favorable to the prosecution, *any* rational fact finder could have found the defendant guilty beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789 (emphasis in original). This review must include the whole record, as a rational fact finder does. *Gibson*, 2015-0682, p. 12, 186 So.3d at 780 (citing *State v. Mussall*, 523 So.2d 1305, 1310 (La. 1988)).

"It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence." *State v. Johnson*, 619 So.2d 1102, 1109 (La. App. 4th Cir. 1993) (citing *State v. Rosiere*, 488 So.2d 965, 968 (La. 1986); *see also Gibson*, 2015-0682, p. 13, 186 So.3d at 780 ("'[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence'" (quoting *State v. Smith*, 600 So.2d 1319, 1324 (La. 1992)). "[C]redibility determinations, as well as the weight to be attributed to the evidence, are soundly within the province of the" fact finder. *State v. Brumfield*, 93-2404, pp. 5-6 (La. App. 4 Cir. 6/15/94), 639 So.2d 312, 316.

***Second Degree Murder/Failure to Negate Self-Defense***

Second degree murder is the killing of a human being "[w]hen the offender

18

has a specific intent to kill or to inflict great bodily harm." La. R.S. 14:30.1(A)(1). In this case, Mr. White does not contest that he intentionally shot and killed Mr. Lee. However, Mr. White asserts that the shooting was committed in self-defense, meaning the shooting was justified, and that the State failed to prove otherwise.

"When a defendant asserts that he acted in self-defense in a homicide case, it is settled law that the state bears the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense." *State v. DeGruy*, 2016-0891, p. 18 (La. App. 4 Cir. 4/5/17), 215 So.3d 723, 733 (citing *State v. Jefferson*, 2004-1960, p. 10 (La. App. 4 Cir. 12/21/05), 922 So.2d 577, 587-88).

Under La. R.S. 14:18, "[t]he fact that an offender's conduct is justifiable, although otherwise criminal, shall constitute a defense to prosecution for any crime based on that conduct [under certain circumstances]." "A homicide is justifiable: [w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." La. R.S. 14:20(A)(1).

In support of his alleged justification, Mr. White asserts that C.P. testified "Mr. Lee was stepping out of the car to fight." A review of the trial testimony cited by Mr. White reflects that C.P. did not testify that Mr. Lee was stepping out of his vehicle to fight Mr. White. In fact, contrary evidence was presented.

First, there was no testimony to the effect that Mr. Lee stepped out of the vehicle. The video from Dickie Brennan's restaurant showed that upon opening the car door, Mr. White opened fire. Mr. Lee had no opportunity to step out. Second, a review of the trial transcript pages cited by Mr. White make no reference to Mr. Lee's intent (that he was gearing up for a fight). In fact, C.P. denied ever saying that Mr. Lee was ready for a fight. Specifically, the transcript reflects the

following exchange:

> Q.  Do you recall telling them that Charles [Mr. Lee] started stepping out to fight Chris [Mr. White]?
>
> A.  I don't believe those were my exact words.  What I said was probably along the lines of – I can't remember exactly what I said.  But, yes, he had opened the door.

Next, Mr. White avers that there was evidence that Mr. Lee was armed.  He refers to the video (the first Penthouse Club video) which, according to him, showed that Mr. Lee had "a dark colored object in his pocket."  Mr. White's assertion in this regard is not supported by either Det. Poluikis's testimony or the video.  As set forth elsewhere in this opinion, Det. Poluikis testified, and the video showed, a slight dark discoloration at the top right-side of Mr. Lee's red pants.  Det. Poluikis could not speculate as to the cause of the discoloration.  Nonetheless, Mr. White further asserts: "In the video, Mr. Lee reaches to the back of his pants."  However, the video does not reflect any movement on the part of Mr. Lee reaching to the back of his pants.  The testimony which Mr. White references concerned Det. Poluikis's testimony regarding the movements of Mr. Washington, as reflected on the video.  As stated earlier, Det. Poluikis testified, and the video depicted, Mr. Washington, after the shooting as he is leaving the scene, place "his left hand on his upper left hamstring area."  There was no testimony or video evidence reflecting that Mr. Lee reached for an object located in the back of his red pants.  Indeed, no one saw Mr. Lee in possession of a weapon at the time of the shooting.  D.M., on re-direct examination, confirmed that she never saw Mr. Lee with a gun.  Similarly, C.P. testified that she never saw Mr. Lee with a weapon; and Mr. Lee did not threaten either her or D.M. with a weapon.

20

In an attempt to show that Mr. Lee precipitated the events leading up to his death, Mr. White asserts that Mr. Lee could have avoided what happened by driving away instead of opening his door. However, the video evidence reflects that Mr. Lee's vehicle, along with other vehicles, could not travel down Iberville Street because Mr. White's car was blocking the street. Mr. White also reiterates that Mr. Lee "reached towards his back." As stated above, the evidence does not support this claim. Mr. White seems to confuse Mr. Washington's actions with those of Mr. Lee. Further, the video, reflecting Mr. Washington's movements as he was exiting the scene, does not show him reaching towards his back, as if reaching for a weapon. As Det. Poluikis stated (and the video confirmed), Mr. Washington placed "his left hand on his upper left hamstring area."

Mr. White, in an effort to show that Mr. Lee was armed before he fired four shots killing him, claims that Mr. Washington "removed something from [the victim] or the car before leaving the scene." However, there is no evidence to support this claim. A review of the video from Dickie Brennan's restaurant reflects that Mr. Washington, following the shooting, walked to the driver's side of Mr. Lee's car, but it does not reflect what he did during that brief period of time.

Mr. White maintains that the State "did not rebut the evidence that [he] reasonably believed Mr. Lee was armed" and therefore, did not meet its burden of showing that he did not act in self-defense. However, Mr. White set forth no evidence reflecting that Mr. Lee was armed, much less that Mr. White, upon Mr. Lee simply opening his door, reasonably believed Mr. Lee was armed. Instead, the video reflects that Mr. White, before Mr. Lee could exit his car, immediately

21

opened fire.[11]

Based on the evidence presented, the State satisfied its burden of proof that Mr. White did not act in self-defense. Mr. White's claim that there was insufficient evidence to support his second degree murder conviction is without merit.

***Obstruction of Justice***

Mr. White, after shooting Mr. Lee, fled the scene; indeed, he fled Louisiana, traveling to Florida. The gun he used to kill Mr. Lee was never recovered. Despite his actions in this regard, Mr. White contends he "had no intent to distort an investigation" of the murder. Mr. White maintains that the removal of the gun does not disprove that he acted in self-defense and hence, he was not criminally responsible for the murder. Mr. White avers that because there was no murder, as he acted in self-defense, there was nothing to obstruct.

La. R.S. 14:130.1 defines obstruction of justice, in pertinent part, as follows:

A. The crime of obstruction of justice is any of the following when committed with the knowledge that such act has, reasonably may,

---

[11] Mr. White also contends the district court improperly granted the State's request for an aggressor jury instruction. Mr. White asserts that such an instruction undercut his defense of justification because a justification defense is unavailable to an offender "who is the aggressor or who brings on a difficulty . . . unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict." La. R.S. 14:21; *State v. Abbott,* 2017-0016, p. 17 (La. App. 4 Cir. 6/14/17), 222 So.3d 847, 857. Mr. White claims that there was "no evidence" reflecting that he was the aggressor. Instead, he alleges Mr. Lee was the aggressor; "Mr. Lee started the incident by exiting the car and Mr. White [defendant] reacted quickly."

Contrary to the above claim, evidence was presented that Mr. White was the aggressor. First, Mr. White blocked traffic on the street where Mr. Lee's vehicle was parked, effectively preventing Mr. Lee from exiting the scene. Thereafter, Mr. White purposefully walked, armed with a gun, to Mr. Lee's car and almost immediately, after Mr. Lee opened his car door, before he had an opportunity to exit, started firing. This scenario provides evidence that Mr. White was the aggressor.

Mr. White, in support of his claim that Mr. Lee, rather than himself, was the aggressor, points out that Mr. Lee assaulted D.M. and C.P. months prior to the shooting. Mr. White asserts that he was coming to the rescue of C.P. and D.M. However, both C.P. and D.M. testified that on October 24, 2018, the date of the shooting, they did not see Mr. Lee with a weapon. Specifically, C.P. stated that on the date of the incident Mr. Lee did not threaten either her or D.M. with a weapon.

22

or will affect an actual or potential present, past, or future criminal proceeding as described in this Section:

(1) Tampering with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding. Tampering with evidence shall include the intentional alteration, movement, removal, or addition of any object or substance either:

(a) At the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any investigation by state, local, or United State law enforcement officers.

"'Specific intent' is the state of mind that exists when circumstances indicate the offender actively desired prescribed criminal consequences to follow his act." *State v. Scott*, 2023-0022, p. 15 (La. App. 4 Cir. 8/30/23), 372 So.3d 42, 54, *writ denied*, 2023-01317 (La. 3/19/24), 381 So.3d 707, and *writ denied*, 2023-01318 (La. 3/19/24), 381 So.3d 707 (quoting La. R.S. 14:10(1)). Further, "'[s]pecific intent [to commit obstruction of justice] need not be proven as fact but may be inferred from the circumstances of the transaction and the actions of defendant.'" *Id*. (quoting *State v. Harvey*, 2021-0730, p. 10 (La. App. 4 Cir. 5/25/22), 345 So.3d 1043, 1050.

A review of the video from Dickie Brennan's restaurant shows Mr. White shooting Mr. Lee. Thereafter, both Mr. White and the murder weapon disappeared; as stated above, the gun was never recovered.

However, more than the mere removal of evidence from a crime scene is required to support a conviction for obstruction of justice; "the State must also prove that such removal was done with 'the specific intent of distorting the results of any criminal investigation or proceeding that may reasonably prove relevant to a criminal investigation or proceeding.'" *Scott*, 2023-0022, p. 15, 372 So.3d at 54. While specific intent may be inferred from a defendant's actions, this Court has

23

held that the act of removing a firearm from a crime scene, without more, is insufficient "to prove beyond a reasonable doubt that [the defendant] possessed the specific intent to distort the police investigation." *Id*., 2023-0022, p. 16, 372 So.3d at 55.

In *Scott*, 2023-0022, p. 16, 372 So.3d at 55, the record reflected that the video evidence depicted "[the defendant] fleeing the scene, yet there is no footage of Defendant leaving the rifle at the scene." This Court stated there was no corroborating evidence that defendant intended to distort an investigation, opining:

> The hypothesis that Defendant had the specific intent to distort the results of the police investigation when he left the crime scene is contradicted by the fact that he left behind shell casings (instead of collecting the shell casings ejected from his rifle), video surveillance (instead of destroying the video surveillance that documented his presence in the neighborhood shooting at the SUV), and witnesses (instead of 17 harming the witnesses that were outside on the street at the time of the shooting incident). From this evidence, a rational juror could have inferred that, in taking the firearm with him, Defendant gave no thought to interfering with the results of a criminal investigation or proceeding.

*Id*., 2023-0022, pp. 16-17, 372 So.3d at 55. As such, this Court vacated defendant's conviction for obstruction of justice. *Id*., 2023-0022, p. 17, 372 So.3d at 55.

After *Scott*, this Court re-examined the issue in *State v. Alexander*, 2023-0540, p. 17 (La. App. 4 Cir. 4/23/24), 401 So.3d 105, 115-16, *writ denied*, 2024-00665 (La. 12/11/24), 396 So.3d 968, wherein the defendant deleted the record of a single phone call from his phone, in addition to removing the murder weapon from the scene, which would have revealed that he called a taxi cab "requesting to be transported to the area [of the crime scene shortly before] the murder occurred." This Court found that the totality of defendant's actions indicated his specific intent to destroy evidence of his presence at the crime scene, notwithstanding his

24

admission to detectives that he called the taxi during subsequent questioning. *Id*., 2023-0540, pp. 17-18, 401 So.3d at 116.

In contrast to *Alexander*, the record in this case does not reflect any additional action by Mr. White to impede or distort the investigation aside from his apparent removal of the firearm he brandished from the scene of the shooting. Instead, the present matter is analogous to *Scott*. Mr. White left numerous witnesses at the scene unharmed, he did not attempt to obscure cameras, and he did not attempt to collect any projectiles. Accordingly, as this Court found in *Scott*, we find a rational juror could have inferred that, in taking the firearm with him, Mr. White gave no thought to interfering with the results of a criminal investigation or proceeding. Having found evidence of Mr. White's intent lacking, we vacate his conviction and sentence for obstruction of justice.

### Human Trafficking

During the time period involved herein (December 1, 2017 to November 7, 2018), the human trafficking statute, La. R.S. 14:46.2, provided, in pertinent part:

A. It shall be unlawful:

(1)(a) For any person to knowingly recruit, harbor, transport, provide, solicit, receive, isolate, entice, obtain, or maintain the use of another person through fraud, force, or coercion to provide services or labor.

Mr. White asserts that there was insufficient evidence to support his human trafficking conviction because the State failed to prove that the human trafficking of D.M. and C.P. occurred due to fraud, force, or coercion; neither victim testified that any fraud, force, or coercion on the part of Mr. White was involved. However, it is undisputed that during the majority of the pertinent period, the victims, D.M.

and C.P., were under the age of twenty-one.[12]

During the time D.M. and C.P. worked for Mr. White, La. R.S. 14:46.2(A)(1)(b) provided:

A. It shall be unlawful:

(1)(b) For any person to knowingly recruit, harbor, transport, provide, solicit, sell, purchase, receive, isolate, entice, obtain, or maintain the use of a person **under the age of twenty-one years** for the purpose of engaging in commercial sexual activity **regardless of whether the person was recruited, harbored, transported, provided, solicited, sold, purchased, received, isolated, enticed, obtained, or maintained through fraud, force, or coercion**. It shall not be a defense to prosecution for a violation of the provisions of this Subparagraph that the person did not know the age of the victim or that the victim consented to the prohibited activity. [Emphasis added.]

As set forth in La. R.S. 14:46.2(A)(1)(b), if the victim was under the age of twenty-one at the time the human trafficking took place, the State need not show that Mr. White employed fraud, force, or coercion. Accordingly, Mr. White's claim that there was insufficient evidence to support his human trafficking conviction is without merit. The State was not required to make a showing of fraud, force, or coercion on the part of Mr. White.

### *Wrongful Denial of Instruction on Pandering*

Additionally, and in conjunction with Mr. White's assertion that the State failed to present sufficient evidence that he was guilty of human trafficking, Mr. White avers that the district court erred in denying his request that the jury be instructed with respect to the crime of pandering. According to Mr. White, pandering "is a lesser and included offense of human trafficking."

---

[12] D.M. was born on July 8, 1997. As such, she was under the age of twenty-one until July 8, 2018. C.P.'s birthdate was November 28, 1997. Accordingly, she was under the age of twenty-one during the entire period the human trafficking took place (December 1, 2017 to November 7, 2018).

"When a count in an indictment sets out an offense which includes other offenses of which the accused could be found guilty under the provisions of Article 814 or 815, the court shall charge the jury as to the law applicable to each offense." La. C.Cr.P. art. 803. Louisiana Code of Criminal Procedure Article 814 enumerates the responsive verdicts for crimes. Human trafficking is not listed as having any legislatively approved responsive verdicts. In that case, La. C.Cr.P. art. 815 applies, which states:

> In all cases not provided for in Article 814, the following verdicts are responsive:
>
> (1) Guilty;
>
> (2) Guilty of a lesser and included grade of the offense even though the offense charged is a felony, and the lesser offense a misdemeanor; or
>
> (3) Not Guilty.

The district court denied Mr. White's request for an instruction regarding the crime of pandering on that basis as follows:

> [T]he only responsive verdict for human trafficking in the Code of Criminal Procedure 814 is guilty and guilty of an attempt and not guilty. So the [c]ourt will, pursuant to Code of Criminal Procedure Article 814, follow what the State legislature intended at the time of enacting this particular law.

In *State v. Price*, 2017-0520, p. 3 (La. 6/27/18), 250 So.3d 230, 232, the Louisiana Supreme Court defined the term, "lesser and included grade of the offense" as follows:

> Lesser and included offenses are those in which all of the essential elements of the lesser offense are also essential elements of the greater offense charged. *See State v. Porter*, 93-1106 (La. 7/5/94), 639 So.2d 1137; *State v. Dufore*, 424 So.2d 256 (La. 1982); *State ex rel. Elaire v. Blackburn*, 424 So.2d 246 (La. 1982). This court has further clarified:
>
> Stated another way, "**if any reasonable state of facts can be**

27

**imagined wherein the greater offense is committed without perpetration of the lesser offense, a verdict for the lesser cannot be responsive**." *State v. Simmons*, 422 So.2d 138, 142 (La. 1982) (quoting *State v. Poe*, 214 La. 606, 38 So.2d 359, 363 (1948) (on rehearing)). Consequently, evidence which would support a conviction of the charged offense would necessarily support a conviction of the lesser and included offense. *Dufore*, at 258; *Elaire*, at 248-49.

*State v. Simmons*, 01-0293, p. 4 (La. 5/14/02), 817 So.2d 16, 19 (emphasis added).

As noted previously, the human trafficking statute provides, in pertinent part, that the following conduct shall be unlawful:

(b) For any person to knowingly recruit, harbor, transport, provide, solicit, sell, purchase, receive, isolate, entice, obtain, or maintain the use of a person under the age of twenty-one years for the purpose of engaging in **commercial sexual activity** regardless of whether the person was recruited, harbored, transported, provided, solicited, sold, purchased, received, isolated, enticed, obtained, or maintained through fraud, force, or coercion. It shall not be a defense to prosecution for a violation of the provisions of this Subparagraph that the person did not know the age of the victim or that the victim consented to the prohibited activity.

La. R.S. 14:46.2(A)(1)(b) (emphasis added).

In contrast, the focus of the pandering statute is narrower, limited to one particular commercial sexual activity, namely, prostitution, as follows:

A. Pandering is any of the following intentional acts:

(1) Enticing, placing, persuading, encouraging, or causing the entrance of any person into the practice of **prostitution**, either by force, threats, promises, or by any other device or scheme.

(2) Maintaining a place where **prostitution** is habitually practiced.

(3) Detaining any person in any place of **prostitution** by force, threats, promises or by any other device or scheme.

(4) Receiving or accepting by a person as a substantial part of support or maintenance anything of value which is known to be from the earnings of any person engaged in **prostitution**.

(5) Consenting, on the part of any parent or tutor of any person, to the person's entrance or detention in the practice of **prostitution**.

(6) Transporting any person from one place to another for the purpose of promoting the practice of **prostitution**.

La. R.S. 14:84 (emphasis added).

Upon comparing the two statutes, a defendant could be found guilty of the broader human trafficking statute and not be found to have enticed one to engage in prostitution, which would violate the pandering statute. For instance, recruiting a person to engage in a provocative sexually explicit display on a video for a customer paying to view the video would arguably constitute a violation of the human trafficking statute, but would not constitute pandering. Accordingly, because a reasonable state of facts can be presented wherein the greater offense (human trafficking) is committed without perpetration of the lesser offense (pandering), a verdict for the lesser offense cannot be responsive. *See State v. Simmons*, 422 So.2d 138, 142 (La. 1982). Thus, the district court did not err in denying Mr. White's request for a jury instruction regarding the crime of pandering.

**MOTION TO QUASH**

As noted in the procedural history, the State entered a *nolle prosequi* for previous charges and filed a bill of information re-charging Mr. White, in case number 555-321, with manslaughter and attempted second degree murder. The State then charged Mr. White, by bill of indictment in case number 555-405 (current appeal), with one count of second degree murder, one count of obstruction of justice, and one count of human trafficking. The State then entered a *nolle prosequi* to the manslaughter and attempted second degree murder charges set

29

forth in case number 555-321.

In the instant appeal, Mr. White reurges the same arguments set forth in his failed motion to quash and writ application – that "[t]he denial of the motion to quash sanctioned the [s]tate's abuse of process and flaunting of their authority at the expense of the defendant." This Court has recognized that "[o]ur denial of a writ application, regardless of the reasons assigned for the denial, has no precedential value and is a mere statement that the court is declining to review the issues addressed at that time." *State v. Davis,* 2009-0438, p. 19 (La. App. 4 Cir. 1/13/10), 30 So.3d 201, 211. Thus, "[t]he relator-in-writ may again raise the issue on appeal." *Id.*

In *State v. Batiste*, 2005-1571, pp. 5-6 (La. 10/17/06), 939 So.2d 1245, 1249, the Louisiana Supreme Court stated:

> A court's resolution of motions to quash in cases where the district attorney entered a nolle prosequi and later reinstituted charges should be decided on a case-by-case basis. *State v. Love*, 00-3347, p. 14 (La. 5/23/03), 847 So.2d 1198, 1209. In those cases "where it is evident that the district attorney is flaunting his authority for reasons that show that he wants to favor the State at the expense of the defendant, such as putting the defendant at risk of losing witnesses, the trial court should grant a motion to quash and an appellate court can appropriately reverse a ruling denying a motion to quash in such a situation." *Id*. In this case, however, there is no indication that the district attorney was flaunting his authority at the expense of the defendant. Rather, the record indicates a nolle prosequi was entered because the victim was not present for trial and was wavering in her commitment to going forward with the case.

*See also State v. Love*, 2000-3347, p. 14 (La. 5/23/03), 847 So.2d 1198, 1209 (a trial court should grant motions to quash in cases in which the State dismisses and reinstitutes charges only "where it is evident that the district attorney is flaunting his authority for reasons that show that he wants to favor the State at the expense of the defendant, such as putting the defendant at risk of losing witnesses."); *State*

*v. Carter*, 2002-1279 (La. App. 4 Cir. 1/29/03), 839 So.2d 390; *State v. Larce*, 2001-1992 (La. App. 4 Cir. 1/23/02), 807 So.2d 1080.

In *State v. Johnson*, 2020-00743, p. 4 (La. 9/30/21), 330 So.3d 295, 297, the defendant filed a motion to quash asserting the State *nolle prossed* the case to evade the time limitation on trial contained in La. C.Cr.P. art. 578. The district court granted the motion to quash, finding that the State had flaunted its authority to dismiss and reinstate. *Id*. The district court found the State had done so at the defendant's expense. *Id*. The district court found further that the State's claim that a witness was unavailable was used as a pretext and the State was simply unprepared for trial. *Id*. The court of appeal found the district court abused its discretion in granting the defendant's motion to quash because the defendant was not prejudiced by the delay. *Johnson*, 2020-00743, p. 5, 330 So.3d at 298. The Supreme Court reversed, finding the district court did not abuse its discretion in granting the motion to quash because the record supported the trial court's finding that the absence of the witness was a pretext and that the State was simply unprepared for trial. *Johnson*, 2020-00743, p. 10, 330 So.3d at 301. The Louisiana Supreme Court noted:

> This court summarized the pertinent jurisprudence in *State v. Reimonenq*, 2019-0367 (La. 10/22/19), 286 So.3d 412. We wrote:
>
>> District attorneys are imbued with vast authority over criminal prosecutions—they alone determine whom, when, and how they shall prosecute and may dismiss an indictment or a count in an indictment at their discretion without leave of court. *See* La. Const. art. V, § 26(B); La.C.Cr.P. art. 61. Indeed, they alone determine whether to dismiss a case. *State v. Sykes*, 364 So.2d 1293, 1297 (La. 1978). A dismissal is generally not a bar to a subsequent prosecution for the same offense. However, a district attorney's exercise of this power cannot impinge on the accused's right to a speedy trial because that right is "'fundamental' and is imposed by the Due Process

Clause of the Fourteenth Amendment on the States." *Barker v. Wingo*, 407 U.S. 514, 515, 92 S.Ct. 2182, 2184, 33 L.Ed.2d 101 (1972).

This Court has primarily explored the limits of the district attorney's ability to dismiss and reinstitute criminal charges through the speedy trial lens, or more generally, the delay caused when a district attorney dismisses charges in response to a denied request for a continuance. *See State v. King*, 10-2638 (La. 5/6/11), 60 So.3d 615 (per curiam); *State v. Batiste*, 05-1571 (La. 10/17/06), 939 So.2d 1245; *State v. Love*, 00-3347 (La. 5/23/03), 847 So.2d 1198. In *Love*, the State entered an order of nolle prosequi when[, after] the State's witness [had previously] suffered a heart attack during voir dire, and the trial court denied the State's request for a continuance [when the witness was unavailable again two months later]. This Court held that: (1) the unavailability of a state witness was a legitimate reason for delaying trial under the Speedy Trial Clause; (2) the record supported the trial court's decision to deny the state's motion for continuance based on the unavailability of the state's witness for valid medical reasons; (3) the trial court acted within its discretion in denying defendant's motion to quash; (4) a 22-month delay in prosecuting defendant was presumptively prejudicial; but, (5) defendant's right to a speedy trial was not violated. Under the circumstances presented in *Love*, this Court found that "the State did not seek to gain an unfair advantage over the defendant." *Love*, 00-3347, p. 12, 847 So.2d at 1208.

In *Batiste*, the State entered an order of nolle prosequi because the victim was not present for trial and was unsure whether she wanted to go forward with her testimony, and then reinstituted the charge a month later. Defendant complained that he suffered a speedy trial violation. Under the circumstances presented in *Batiste*, this court found that "there was a legitimate reason for the nolle prosequi in this case," and "the record reveals no intentional delay on the State's part for the purpose of gaining a tactical advantage." *Batiste*, 05-1571, p. 6-7, 939 So.2d at 1249-50. Thus, the *Batiste* court found there was "no indication the district attorney was flaunting his authority at the expense of the defendant ...." *Id.*, 05-1571, pp. 5-6, 939 So.2d at 1249.

In *King*, the State entered an order of nolle prosequi after a bank failed to comply with its subpoena for records,

and the trial court denied its request for a continuance. The State later reinstituted the charges. Quoting from *State v. Love*, this court found as follows: "In situations where it is evident that the district attorney is flaunting his authority for reasons that show that he wants to favor the State at the expense of the defendant, such as putting the defendant at risk of losing witnesses, the trial court should grant a motion to quash[,] and an appellate court can appropriately reverse a ruling denying a motion to quash in such a situation." *King*, 10-2638, pp. 5-6, 60 So.3d at 618 (quoting *Love*, 00-3347, p. 14, 847 So.2d at 1209).

*Reimonenq*, 2019-0367, pp. 4-5, 286 So.3d at 415-16 (footnotes omitted; edited for consistency).

*Johnson*, 2020-00743, pp. 5-7, 330 So.3d at 298-99.

In this case, Mr. White claims that as a result of the delay in trial proceedings, he "no longer had contact with anyone or any witness who could help him." However, Mr. White fails to specify any witness he planned to call at the first trial setting that he was unable to call when the matter ultimately proceeded to trial. Mr. White has failed to demonstrate (and the record does not support such a finding) that the State, as a result of its action which resulted in a delay of his trial, took said action to gain an unfair advantage. As such, this claim lacks merit.[13]

**HEARSAY/CONFRONTATION OF WITNESSES**

Mr. White contends the district court erred in preventing him from presenting relevant, admissible evidence in his defense (specifically, evidence of Mr. Lee's earlier arrest), while allowing the State to rely on hearsay testimony to support a conviction. Mr. White further maintains that the unconstitutional

---

[13] We note that an appropriate and effective remedy in a matter wherein the State has arguably flaunted its authority to dismiss and reinstitute charges based on an unpreparedness to go to trial and comply with discovery deadlines would be the institution of contempt proceedings rather than quashing the charges, which would result in a windfall for the defendant. *See State v. Smith*, 2024-0092, p. 11 n.6 (La. App. 4 Cir. 4/11/25), ___ So.3d ___, ___, 2025 WL 1088100, *6.

provisions of La. R.S. 14:46.2(A)(1)(b), as well as the State's alleged discovery violations precluded him from defending himself against the charges lodged.

***Hearsay Testimony from Detective Poluikis***

Mr. White points to three instances in which inadmissible hearsay testimony from Det. Poluikis was (allegedly) admitted regarding the statements made by Mr. Washington. Mr. White avers that the State was allowed to introduce evidence regarding Mr. Washington's version of events without having Mr. Washington testify at trial, thereby denying him his right to cross-examine Mr. Washington.

First, Mr. White asserts that Det. Poluikis "was allowed to testify that Keilon Washington said he went to [Mr. Lee's] side of the car to try to move him and drive him to the hospital, contrary to the video evidence of Washington moving things around inside the car." Defense counsel lodged an objection in connection with the prosecutor's question as to what Mr. Washington indicated was his reason for "going back to the driver's side" of the vehicle following the shooting, but the trial court overruled the objection.

Second, Mr. White claims that Det. Poluikis improperly "vouched for Washington's credibility." The prosecutor asked whether Det. Poluikis had any reason to believe that Mr. Washington was lying and Det. Poluikis responded "No." Defense counsel did not lodge an objection to the prosecutor's inquiry in this regard.

Third, Mr. White objects to Det. Poluikis's testimony that after speaking with Mr. Washington, he obtained an arrest warrant for Mr. White. Specifically, the trial transcript reflects the following exchange to which defense counsel, once again, lodged no objection:

Q. What was the very next step in your investigation after meeting with Ke[i]lon?

A. I applied for an arrest warrant for second degree murder for Christopher White.

According to Mr. White, the above exchange constituted "indirect hearsay as the only conclusion to be drawn was that Mr. Washington identified Mr. White as the perpetrator."

"'Hearsay' is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." La. C.E. art. 801(C). "One of the primary justifications for the exclusion of hearsay is that the adversary has no opportunity to cross-examine the absent declarant to test the accuracy and completeness of the testimony." *State v. Wille*, 559 So.2d 1321, 1329 (La. 1990). The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374, 158 L.Ed.2d 177 (2004), the Supreme Court held that out-of-court statements by witnesses that are testimonial are barred, under the Confrontation Clause, unless witnesses are unavailable and the defendant had the prior opportunity to cross-examine the witnesses, regardless of whether such statements are deemed reliable by the court.

As an initial matter, to the extent defense counsel at trial failed to object to the alleged hearsay testimony, specifically, Det. Poluikis's alleged vouching for Mr. Washington's credibility and the alleged indirect hearsay purportedly leading to the conclusion that Mr. Washington identified Mr. White as the perpetrator, any claim concerning the admissibility of the evidence is waived on appeal. "An irregularity or error cannot be availed of after verdict unless it was objected to at

the time of occurrence." La. C.Cr.P. art. 841(A). "'The defense is limited on appeal to those grounds articulated at trial.'" *State v. Edwards*, 2021-0494, p. 18 (La. App. 4 Cir. 2/16/22), 336 So.3d 479, 490 (quoting *State v. Keys*, 2012-1177, p. 13 (La. App. 4 Cir. 9/4/13), 125 So.3d 19, 31.

Additionally, it is well-established that the erroneous admission of hearsay is subject to harmless error analysis. *Wille*, 559 So.2d at 1332; *Edwards,* 2021-0494, p. 18, 336 So.3d at 490; *State v. Hart,* 2010-1614, p. 5 (La. App. 4 Cir. 11/2/11), 80 So.3d 25, 30 (confrontation errors are subject to harmless error analysis); *State v. Lawrence,* 2008-0397, p. 9 (La. App. 4 Cir. 2/4/09), 5 So.3d 896, 902; *State v. Huckabay,* 2000-1082, p. 26 (La. App. 4 Cir. 2/6/02), 809 So.2d 1093, 1108 (citing *State v. Broadway,* 96-2659, p. 24 (La. 10/19/99), 753 So.2d 801, 817).

In *State v. Thomassie,* 2016-0370, pp. 11-12 (La. App. 4 Cir. 12/21/16), 206 So.3d 311, 318, this Court discussed the harmless error standard as follows:

> "'Harmless error analysis begins with the premise that the evidence is otherwise sufficient to sustain the conviction if viewed from the perspective of a rational fact finder and asks whether beyond a reasonable doubt the error could not have contributed to the verdict actually returned by the defendant's jury.'" [*State v.*] *Campbell,* [20]15-0017, p. 27 [(La. App. 4 Cir. 6/24/15),] 171 So.3d [1176,] 192 (quoting *State v. Gibbs*, 41,062, p. 8 (La. App. 2 Cir. 6/28/06), 935 So.2d 349, 354); [*State v.*] *Dove*, [20]15–0783, p. 30 [(La. App. 4 Cir. 5/4/16)], 194 So.3d [92], 112, n. 3. *See also Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). Stated otherwise, harmless error exists when the guilty verdict actually rendered was "surely unattributable" to the error. *State v. Higginbotham*, [20]11-0564, p. 3 (La. 5/6/11), 60 So.3d 621, 623. "A trial error ... may 'be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt.'" *State v. Merwin*, [20]15–0681, p. 18 (La. App. 4 Cir. 1/27/16), 186 So.3d 759, 769 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 308-09, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)).

Of the three above-described instances of alleged impermissible hearsay

testimony highlighted by Mr. White, as noted above, the only one to which defense counsel lodged an objection, the trial court overruled – that Det. Poluikis testified regarding Mr. Washington's statement that he went to Mr. Lee's side of the car to try to move him and drive him to the hospital - constitutes harmless error. The shooting of Mr. Lee before Mr. Lee was able to exit his vehicle was captured on the video footage from Dickie Brennan's restaurant. Further, both D.M. and C.P. confirmed on the witness stand that Mr. White shot Mr. Lee and neither saw Mr. Lee with a weapon. Indeed, while Mr. White claims that the first Penthhouse Club video showed that Mr. Lee had a dark object in the back of his red pants, suggesting that the dark object was a gun, Det. Poluikis referred to the dark spot as a discoloration. Further, contrary to Mr. White's assertion, Det. Poluikis's testimony as to Mr. Washington's comment as to what he was doing on the driver's side of Mr. Lee's vehicle was not contrary to the video evidence. Additionally, the video does not corroborate Mr. White's suggestion that Mr. Washington retrieved a weapon from the vehicle.

Based upon the record, Mr. White's guilty verdict on the charge of second degree murder was surely unattributable to Det. Poluikis's hearsay testimony regarding Mr. Washington's comment as to what he was doing on the driver's side of Mr. Lee's car. No evidence was submitted reflecting Mr. Lee was armed. Accordingly, the admission of the above-described hearsay testimony does not, as Mr. White asserts, warrant a new trial.

### *Hearsay Testimony from Detective Williams*

Mr. White also maintains that the district court, over his objection, permitted Det. Williams, qualified as an expert in digital forensics, to provide hearsay testimony regarding the content extracted from the cell phones and electronic

37

devices recovered following the arrests of C.P. and Mr. White in Florida. According to Mr. White, only "the persons involved in the texts and photographs [could] testify as to the content." However, Mr. White's argument in this regard is disingenuous in that when two of the persons associated with this electronic evidence, C.P. and D.M., testified and were questioned regarding the content of their cell phones and devices, defense counsel objected, asserting they were not the proper witnesses to introduce such evidence. Thereafter, when Det. Williams testified regarding the content of the electronic evidence, defense counsel, once again, objected. In overruling defense counsel's objection to Det. Williams' testimony, the district court recognized the hypocrisy of defense counsel's argument, stating:

> When he [the prosecutor] attempted to get the conversations in through the witnesses [D.M. and C.P.], you objected. And, basically, said that it was improper because they weren't the people that had extracted the information. Now that we have the detective who extracted the information, you're saying it's improper because they're not the people – that he's not the -- he doesn't have a knowledge of the conversation that was had between the individuals. We're not going to play this back-and-forth game.

Additionally, once again, any hearsay evidence improperly admitted constituted harmless error. Mr. White sets forth the hearsay testimony that was allegedly prejudicial - Det. Williams' description of Mr. White's jewelry, as depicted in photographs, as expensive; his comments on vehicle and phone registrations; and his claim to know the dates and times the videos were made. According to Mr. White, this hearsay testimony "portrayed [him] differently than C.P. and D.M. described and contributed to the verdict on Count 3 [human trafficking]." However, both D.M. and C.P. testified that their commercial sexual activities were carried out pursuant to Mr. White's directives. Mr. White, for

38

practical purposes, completely controlled them. They provided Mr. White with the money they received and Mr. White, in turn, provided them with food, clothing and shelter. Mr. White is correct to the extent that neither D.M. nor C.P. painted him as a predator, though he did, on various occasions, use force against them. However, as noted above, due to the victims' young ages, the State was not required to prove that Mr. White had D.M. and C.P. engage in sexual activities by using fraud, force, or coercion. Even accepting that Det. Williams painted a less flattering picture of Mr. White than what D.M. and C.P. described, that difference is irrelevant. The State, for purposes of proving Mr. White was guilty of human trafficking did not have to show that he maintained the young women for the purpose of engaging in commercial sexual activity via fraud, force, or coercion. Only a showing that he, in fact, maintained them for the purpose of engaging in commercial sexual activity was sufficient; the young women's testimony clearly satisfied that burden and the admission of Det. Williams' alleged hearsay testimony was harmless.

### Prevented from Presenting Evidence of Mr. Lee's Criminal History[14]

Mr. White avers the district court erred in granting the State's motion to prevent the defense from presenting evidence of Mr. Lee's criminal history, specifically, his arrest approximately two months prior to his murder on the charge of being a convicted felon in possession of a firearm found in a backpack located in the back seat of Mr. Lee's car.[15] At the time of Mr. Lee's arrest, a summons was

---

[14] As an ancillary matter, Mr. White also complains that he was not permitted to submit evidence of a summons issued for Mr. Washington in connection with Mr. Washington's alleged possession of marijuana.

[15] The matter arose when the State discovered that the defense had subpoenaed the officers who arrested Mr. Lee two months earlier. At that time, the State moved to prevent the admission of evidence regarding Mr. Lee's earlier arrest. Following argument, the district court took the matter under advisement. Later, the district court issued its ruling, determining that evidence of

issued for Mr. Washington because he was a passenger in Mr. Lee's vehicle where marijuana was found. According to Mr. White, said evidence was necessary in order to challenge Det. Poluikis's endorsement of Mr. Washington's credibility and to substantiate his claim that at the time of the shooting he feared Mr. Lee possessed a weapon and that Mr. White shot Mr. Lee in self-defense.

Mr. White's claim that Mr. Washington's possession of marijuana impinged upon his credibility and Det. Poluikis's belief that Mr. Washington had not lied to him is dubious. If Mr. Washington had been arrested for a crime involving some type of fraud or some crime that would call his credibility into question, Mr. White may have made a viable argument. However, being cited for possessing marijuana is not directly related to the witness's credibility.

Mr. White's contention that his self-defense claim was undermined when he was not allowed to introduce evidence of Mr. Lee's earlier arrest is likewise without merit. Such evidence is not admissible in the absence of an overt act of hostility on the part of the victim at the time of the shooting. Specifically, La. C.E. art. 404(B)(2) provides, in pertinent part:

> In the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of the victim's prior threats against the accused or the accused's state of mind as to the victim's dangerous character is not admissible . . . .

This provision has been explained as follows:

> When a defendant pleads self-defense, evidence of the victim's dangerous character or of threats against the defendant is relevant to show the victim was the aggressor and that the defendant's fear of danger was reasonable. *State v. Edwards*, 420 So.2d 663, 669 (La.

---

Mr. Lee's earlier arrest would not be admitted, reasoning: "[I]t is this Court's belief that [the] arrest is improper character evidence. It's not probative to the case at hand. I think it will be confusing to the jury. And it's an improper attack on the character of the victim in this particular case."

1982); *State v. Montz*, 92-2073 (La. App. 4th Cir 2/11/94), 632 So.2d 822, 824-825, *writ denied*, 94-0605 (La. 6/3/94), 637 So.2d 499.

For such evidence to be admissible, the defendant must first produce evidence that at the time of the incident the victim made a hostile demonstration or committed an overt act against him of such character that would have created in the mind of a reasonable person the fear that he was in the immediate danger of losing his life or suffering great bodily harm. *State v. Gantt,* 616 So.2d 1300, 1304 (La. App. 2nd Cir. 1993), *writ denied*, 623 So.2d 1302 (La. 1993). An overt act is any act which manifests to the mind of a reasonable person a present intention to kill or inflict great bodily harm. *Edwards*, *supra* at 669.

Once evidence of an overt act is established, evidence of the victim's threats to the defendant and of the victim's dangerous character are admissible: (1) to show the defendant's reasonable apprehension of danger justifying his conduct and (2) to help determine who was the aggressor. *Edwards*, *supra* at 670.

If the purpose is to show the defendant's reasonable apprehension of danger, it must be shown that the defendant *knew* of the victim's prior threats or reputation. *Edwards*, *supra*, at 670; *State v. Eishtadt,* 531 So.2d 1133, 1135 (La. App. 4th Cir. 1988). Once this knowledge is established, evidence of the victim's character, both general reputation and specific threats or acts of violence against the defendant are admissible. *Edwards*, *supra*, at 670.

If the purpose is to show that the victim was the aggressor, there is no requirement that the defendant know of the victim's prior acts or reputation. *Eishtadt*, *supra*[,] at 1135.

*State v. Williams,* 96-1587, pp. 7-8 (La. App. 4 Cir. 4/16/97), 693 So.2d 249, 253-54.

Mr. White contends that the necessary overt acts on the part of the victim, Mr. Lee, consisted of "parking his car and starting to exit while reaching towards his back [presumably for a gun]." However, Mr. Lee was not parking his car at the time of the incident. Mr. Lee, as well as other drivers, was forced to stop in the middle of the street because Mr. White blocked the road with his car. Second, there was no evidence supporting the contention that Mr. Lee was "starting to exit while reaching towards his back." As the State represents in its brief:

"[R]epeating the unsupported allegation that [the victim] was reaching toward his back does not magically make it evidence."

Assuming, *arguendo,* that at the time of the shooting there was an overt act of hostility on the part of Mr. Lee, Mr. White could not prove that he knew of the prior act (Mr. Lee's recent arrest on the charge of being a convicted felon in possession of a weapon in a backpack located in the back seat of his car). As such, evidence of this prior act was not admissible to show Mr. White had a reasonable apprehension of danger. If the prior act was being offered to show that Mr. Lee was the aggressor, such evidence was still properly excluded since (1) the video from Dickie Brennan's restaurant clearly showed that Mr. White, not Mr. Lee, was the aggressor; and (2) the excluded evidence did not constitute an act of aggression on the part of Mr. Lee.

### *Unconstitutionality of La. R.S. 14:46.2(A)(1)(b) Prevented Defense Based on the Consent of the D.M. and C.P.*

Mr. White contends La. R.S. 14:46.2(A)(1)(b) is unconstitutional because it restricted his ability to raise a defense based on the alleged consent of D.M. and C.P. who, according to Mr. White, willingly engaged in commercial sexual activity at his behest. As noted earlier, La. R.S. 14:46.2(A)(1)(b), provides, in pertinent part:

> It shall be unlawful:
>
> For any person to knowingly recruit, harbor, transport, provide, solicit, sell, purchase, patronize, procure, hold, restrain, induce, threaten, subject, receive, isolate, entice, obtain, or maintain **the use of a person under the age of twenty-one years for the purpose of engaging in commercial sexual activity regardless of whether the person was recruited, harbored, transported, provided, solicited, sold, purchased, received, isolated, enticed, obtained, or maintained through fraud, force, or coercion.** [Emphasis added.]

Thus, due to the young ages of the victims, their alleged consent was not relevant.

A review of the record reflects that Mr. White did not raise a constitutional challenge to the provisions of La. R.S. 14:46.2(A)(1)(b) during his trial. "It is well-settled that a constitutional challenge may not be considered by an appellate court unless it was properly pleaded and raised in the trial court below." *State v. Hatton,* 2007-2377, p. 13 (La. 7/1/08), 985 So.2d 709, 718. Accordingly, Mr. White is precluded from raising the instant claim on appeal.

### *State's Discovery Violations Impeded His Defense*

Mr. White avers the State's alleged discovery violations precluded him from defending himself against the charges lodged. Specifically, Mr. White maintains that it was not until shortly before trial was set to commence that the State produced the numerous calls he made during his incarceration pending trial,[16] along with the cell phone extractions about which Det. Williams testified. Mr. White contends that the State's failure to timely produce the above-described evidence "cannot be looked upon as harmless error where the failure relates to a due process violation such as failure to timely divulge evidence necessary to the defense." Mr. White acknowledges that the State's alleged failure to comply with discovery rules does not warrant an automatic reversal; "prejudice must be shown." Mr. White has failed to show that the evidence produced near the time of trial was necessary to his defense or that he was prejudiced by the State's alleged discovery violation.

With respect to the cell phone extractions, as discussed above, Mr. White's only contention was that Det. Williams' testimony regarding the extractions painted him in an unflattering light, which the testimony of D.M. and C.P. allegedly did not support. However, as explained elsewhere in this opinion, said

---

[16] Mr. White admits the State introduced only two of his jail calls at trial.

43

testimony was not critical to his defense of the human trafficking charge. His facilitation of their commercial sexual activity was not at issue; once again, the State was not required to show that Mr. White enticed the victims through fraud, force, or coercion.

With respect to the recordings of numerous jail calls provided shortly before trial, as Mr. White sets forth, the district court denied Mr. White's request for a trial continuance based on their late disclosure, reasoning that, as Mr. White participated in these calls, he was aware of their existence and content. Moreover, as the State points out, "jail calls made by an inmate are available to the inmate and his attorney at any time per Securus policy." That being the case, the district court's denial of Mr. White's request for a continuance was not an abuse of discretion. As Mr. White has failed to show prejudice in connection with the State's alleged discovery violations, reversal of his convictions is unwarranted.

### EXCESSIVE SENTENCES

Mr. White asserts that the thirty-year, concurrently-running sentences imposed in connection with his obstruction of justice and human trafficking convictions are excessive. While Mr. White concedes that the thirty-year sentences were not the maximum terms authorized, he maintains that based upon the evidence introduced at trial, he should have received "low range sentences."

First, we must ascertain whether Mr. White preserved his excessive sentence claim for appeal. The record reflects that Mr. White did not object to the concurrently-running, thirty-year sentences at the time they were imposed nor did he file a motion to reconsider his sentences. Under such circumstances, this Court has held that a defendant forfeits his right to seek review of his sentences on appeal. *See State v. Summers,* 2010-0341, p. 11 (La. App. 4 Cir. 12/1/10), 52

44

So.3d 951, 958 ("Because [the defendant] failed either to object or to file a motion to reconsider, he failed to preserve the issue of the excessiveness of his sentence for appeal."); *State v. Johnson*, 93-2092 (La. App. 4 Cir. 6/30/94), 639 So.2d 1236, 1239 ("The defendant has failed to preserve [his excessive sentence] issue for appeal because he did not file a motion to reconsider the sentence according to [La.] C.Cr.P. art. 881.1.").

However, in a more recent case, *State v. Manuel,* 2021-0273, p. 14 (La. App. 4 Cir. 4/6/22), 337 So.3d 967, 974-75, this Court determined even though the defendant neither objected to his sentences nor filed a motion for reconsideration, he was entitled to a bare review for constitutional excessiveness. Specifically, this Court provided:

> Before reviewing the merits of the claim, our review of the record reflects that defendant failed to object to the sentence at the time it was imposed and, thereafter, failed to file a motion to reconsider sentence. Pursuant to La. C.Cr.P. art. 881.1, a defendant's failure to make or file a motion to reconsider sentence shall preclude defendant from urging on appeal any grounds of objection to the sentence. *See State v. Kirkling*, 04-1906, pp. 5-6 (La. App. 4 Cir. 5/18/05), 904 So.2d 786, 790. Due to his failure to object and file a motion to reconsider his sentence, appellate review of defendant's sentence is "limited to a bare review for constitutional excessiveness." *State v. Zeitoun*, 17-0366, p. 10 (La. App. 4 Cir. 11/8/17), 231 So.3d 934, 945.

*Manuel*, 2021-0273, p. 14, 337 So. 3d at 974-75. *See also State v. DeGruy,* 2020-0290, p. 8 (La. App. 4 Cir. 10/29/20), 307 So.3d 258, 264. As such, the Court's review of Mr. White's complaint about his thirty-year, concurrently-running sentences is limited to one of bare constitutional excessiveness.

"Both the Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of cruel and unusual punishment." *State v. Wilson*, 2014-1267, p. 23 (La. App. 4 Cir. 4/29/15), 165 So.3d 1150, 1165. The Louisiana Constitution also prohibits "'excessive

punishment.'" *Id*., (quoting La. Const. art. I, § 20). A sentence is excessive, even when it is within the applicable statutory range, if it is "'grossly disproportionate to the severity of the offense or constitutes nothing more than needless infliction of pain and suffering.'" *Id*., 2014-1267, p. 25, 165 So.3d at 1166 (quoting *State v. Hackett*, 13-0178, p. 14 (La. App. 4 Cir. 8/21/13), 122 So.3d 1164, 1174).

In reviewing a sentence for excessiveness and determining whether the district court abused its discretion, "we must consider the punishment and the crime in light of the harm to society caused by its commission and determine whether the penalty is so disproportionate to the crime committed as to shock our sense of justice." *State v. Bonanno*, 384 So.2d 355, 358 (La. 1980). "The excessiveness of a sentence is a question of law, and a reviewing court will not set aside a sentence absent a manifest abuse of discretion by the trial court." *State v. Bradley*, 2018-0734, pp. 8-9 (La. App. 4 Cir. 5/15/19), 272 So.3d 94, 100. "On appellate review of a sentence, the relevant question is not whether another sentence might have been more appropriate but whether the trial court abused its broad sentencing discretion." *State v. Smith*, 2001-2574, pp. 6-7 (La. 1/14/03), 839 So.2d 1, 4. An appellate "court shall not set aside a sentence for excessiveness if the record supports the sentence imposed." *Bradley*, 2018-0734, p. 9, 272 So.3d at 100.

As we noted above, the maximum sentence in connection with Mr. White's human trafficking conviction was not imposed. Under the provisions of La. R.S. 14:46.2(B)(2)(b), Mr. White, in connection with his human trafficking conviction, was subject to a maximum term of imprisonment of fifty years.

Mr. White asserts that his human trafficking sentence of thirty years imprisonment was excessive because he did not use fraud, force, or coercion to

entice D.M and C.P. to engage in commercial sexual activity. Mr. White emphasizes that D.M. "had been in the business" before meeting him and that both D.M. and C.P. voluntarily agreed to work for him. Mr. White also claims that the two victims "were free to leave at any time."

Mr. White's assertion that he did not resort to fraud, force, or coercion in attaining D.M. and C.P. to work for him, does not detract from the seriousness of the crime. The victims were under twenty-one years old. Further, Mr. White's claim that the victims "were free to leave at any time" is misleading. When D.M. was specifically asked why she did not leave Mr. White, she explained that she had nowhere to go – she had no car; she had no apartment; and Mr. White controlled her money. Similarly, C.P. explained that while she often did not get along with Mr. White, describing their relationship as having "a lot of tension," she did not leave him because she felt she had no choice but to work for him; there was nothing else she could do. She explained that she contemplated leaving Mr. White; but he had control of her car keys, her identification, and her bank card. Further, C.P. stated she did not have anywhere to go. Additionally, as discussed above, Mr. White did, on occasion, use force against D.M. and C.P. when he became angry with them. Accordingly, Mr. White's assertion that his term of imprisonment should be less than thirty years because D.M. and C.P. willingly engaged in commercial sexual activity for his benefit lacks merit. Mr. White's sentence is supported by the record.

## DECREE

For the above-mentioned reasons, we find insufficient evidence was presented as to Mr. White's intent to justify a conviction for obstruction of justice.

Accordingly, we vacate Mr. White's conviction and sentence for obstruction of justice.  The remaining convictions and sentences are affirmed.

**VACATED IN PART;**
**AFFIRMED IN PART**